# MARYLAND v. GARRISON

No. 85-759.   Argued November 5, 1986—Decided February 24, 1987

STEVENS, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and WHITE, POWELL, O'CONNOR, and SCALIA, JJ., joined.   BLACK-

MUN, J., filed a dissenting opinion, in which BRENNAN and MARSHALL, JJ., joined, *post*, p. 89.

*Stephen H. Sachs*, Attorney General of Maryland, argued the cause for petitioner. With him on the briefs were *Deborah K. Chasanow* and *Anne E. Singleton*, Assistant Attorney General.

*Gerald A. Kroop* argued the cause and filed a brief for respondent.*

JUSTICE STEVENS delivered the opinion of the Court.

Baltimore police officers obtained and executed a warrant to search the person of Lawrence McWebb and "the premises known as 2036 Park Avenue third floor apartment."[1] When the police applied for the warrant and when they conducted the search pursuant to the warrant, they reasonably believed that there was only one apartment on the premises described in the warrant. In fact, the third floor was divided into two apartments, one occupied by McWebb and one by respondent Garrison. Before the officers executing the warrant became aware that they were in a separate apartment occupied by respondent, they had discovered the contraband that provided the basis for respondent's conviction for violating Maryland's Controlled Substances Act. The question presented is whether the seizure of that contraband was prohibited by the Fourth Amendment.

The trial court denied respondent's motion to suppress the evidence seized from his apartment, App. 46, and the Mary-

---

*Briefs of *amici curiae* urging reversal were filed for the State of California by *John K. Van de Kamp*, Attorney General, *Steve White*, Chief Assistant Attorney General, and *Ronald E. Niver* and *Clifford K. Thompson, Jr.*, Deputy Attorneys General; and for Americans for Effective Law Enforcement, Inc., et al. by *Fred E. Inbau, Wayne W. Schmidt, James P. Manak, David Crump, Daniel B. Hales*, and *Jack E. Yelverton*.

[1] App. 9, 41. The warrant was issued and executed on May 21, 1982. It authorized the Baltimore police to search the person of McWebb and "the premises known as 2036 Park Avenue third floor apartment" for "Marihuana, related paraphernalia, minies, books, papers, and photographs pertaining to the illegal distribution of Marihuana . . . ." *Id.*, at 9.

land Court of Special Appeals affirmed. 58 Md. App. 417, 473 A. 2d 514 (1984). The Court of Appeals of Maryland reversed and remanded with instructions to remand the case for a new trial. 303 Md. 385, 494 A. 2d 193 (1985).

There is no question that the warrant was valid and was supported by probable cause. *Id.*, at 392, 494 A. 2d, at 196. The trial court found, and the two appellate courts did not dispute, that after making a reasonable investigation, including a verification of information obtained from a reliable informant, an exterior examination of the three-story building at 2036 Park Avenue, and an inquiry of the utility company, the officer who obtained the warrant reasonably concluded that there was only one apartment on the third floor and that it was occupied by McWebb. App. 41; 58 Md. App., at 433, 473 A. 2d, at 522; 303 Md., at 387–390, 494 A. 2d, at 194–195. When six Baltimore police officers executed the warrant, they fortuitously encountered McWebb in front of the building and used his key to gain admittance to the first-floor hallway and to the locked door at the top of the stairs to the third floor. As they entered the vestibule on the third floor, they encountered respondent, who was standing in the hallway area. The police could see into the interior of both McWebb's apartment to the left and respondent's to the right, for the doors to both were open. Only after respondent's apartment had been entered and heroin, cash, and drug paraphernalia had been found did any of the officers realize that the third floor contained two apartments. App. 41–46. As soon as they became aware of that fact, the search was discontinued. *Id.*, at 32, 39. All of the officers reasonably believed that they were searching McWebb's apartment.[2] No further search of respondent's apartment was made.

---

[2] While the search was in progress, an officer in respondent's apartment answered the telephone. The caller asked for "Red Cross"; that was the name by which McWebb was known to the confidential informant. *Id.*, at 6. Neither respondent nor McWebb indicated to the police during the search that there were two apartments. *Id.*, at 38, 39–40.

The matter on which there is a difference of opinion concerns the proper interpretation of the warrant. A literal reading of its plain language, as well as the language used in the application for the warrant, indicates that it was intended to authorize a search of the entire third floor.[3] This is the construction adopted by the intermediate appellate court, see 58 Md. App., at 419, 473 A. 2d, at 515, and it also appears to be the construction adopted by the trial judge. See App. 41. One sentence in the trial judge's oral opinion, however, lends support to the construction adopted by the Court of Appeals, namely, that the warrant authorized a search of McWebb's apartment only.[4] Under that interpretation, the Court of

---

[3] The warrant states:

"Affidavit having been made before me by Detective Albert Marcus, Baltimore Police Department, Narcotic Unit, that he has reason to believe that on the person of Lawrence Meril McWebb . . . [and] that on the premises known as 2036 Park Avenue third floor apartment, described as a three story brick dwelling with the numerals 2–0–3–6 affixed to the front of same in the City of Baltimore, there is now being concealed certain property . . . .

"You are therefor commanded, with the necessary and proper assistants, to search forthwith the person/premises hereinabove described for the property specified, executing this warrant and making the search . . . ." Id., at 9.

[4] Immediately before ruling on the suppression motions made by McWebb and Garrison, the court observed that a search of two or more apartments in the same building must be supported by probable cause for searching each apartment. The court added, "[t]here is an exception to this general rule where the multiple unit character of the premises is not externally apparent and is not known to the officer applying for or executing the warrant." Id., at 45. The trial court then ruled, "It is clear that the warrant specified the premises to be searched as the third floor apartment of the Defendant McWebb . . . ." Id., at 46. This statement only makes sense as a rejection of Garrison's claim that "the warrant was a general warrant as it did not specify which apartment was to be searched on the third floor," id., at 40, and as a recognition that the search was not invalid for lack of specificity in the warrant as to the premises to be searched. We interpret the trial court's statement as a ruling that the search of a subunit of the building—which he referred to as "the third floor

Appeals concluded that the warrant did not authorize the search of respondent's apartment and the police had no justification for making a warrantless entry into his premises.[5]

The opinion of the Maryland Court of Appeals relies on Article 26 of the Maryland Declaration of Rights[6] and Maryland cases as well as the Fourth Amendment to the Federal Constitution and federal cases. Rather than containing any "plain statement" that the decision rests upon adequate and independent state grounds, see *Michigan* v. *Long*, 463 U. S. 1032, 1042 (1983), the opinion indicates that the Maryland constitutional provision is construed *in pari materia* with the

---

apartment of the Defendant McWebb"—was authorized by the warrant. The court then found on the precise facts of this case that the search of Garrison's apartment was valid because "the officers did not know that there was more than one apartment on the third floor and nothing alerted them of such a fact until after the search had been made and the items were [seized]." *Id.*, at 46. The contrary construction adopted by the Court of Appeals fails to take into account the plain language of the warrant, which authorized a search of the person of McWebb and of the premises of 2036 Park Avenue, third floor. *Id.*, at 9.

[5] As the Court of Appeals explained:

"It is undisputed that the police were authorized to search only one apartment, McWebb's; the warrant did not authorize the search of Garrison's apartment. There is no question as to the validity of the search warrant itself. No argument was made in this Court that any of the exceptions to the warrant requirement applied here. It is clear, therefore, that the police had no authority to cross the threshold of Garrison's apartment and seize evidence.

.         .         .         .         .

"Police had a warrant to search McWebb's apartment. They had no warrant to search Garrison's. They had no justification for entering his premises, regardless of appearances." 303 Md. 385, 392–394, 494 A. 2d, 193, 196–197 (1985).

[6] Article 26 of the Maryland Declaration of Rights provides:

"That all warrants, without oath or affirmation, to search suspected places, or to seize any person or property, are grevious [grievous] and oppressive; and all general warrants to search suspected places, or to apprehend suspected persons, without naming or describing the place, or the person in special, are illegal, and ought not to be granted."

Fourth Amendment.[7]   We therefore have jurisdiction.   Because the result that the Court of Appeals reached did not appear to be required by the Fourth Amendment, we granted certiorari.   475 U. S. 1009 (1986).   We reverse.

In our view, the case presents two separate constitutional issues, one concerning the validity of the warrant and the other concerning the reasonableness of the manner in which it was executed.   See *Dalia* v. *United States*, 441 U. S. 238, 258 (1979).   We shall discuss the questions separately.

## I

The Warrant Clause of the Fourth Amendment categorically prohibits the issuance of any warrant except one "particularly describing the place to be searched and the persons or things to be seized."   The manifest purpose of this particularity requirement was to prevent general searches.   By limiting the authorization to search to the specific areas and things for which there is probable cause to search, the requirement ensures that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit.[8]   Thus, the scope of a lawful search is "defined by the object of the search and the places in which there is probable cause to believe that it may be found.   Just as probable cause to believe that a stolen lawnmower may be found in a garage will not support a warrant to search an upstairs bedroom, probable cause to believe that undocumented aliens are being transported in a van will not justify a warrantless

---

[7] 303 Md., at 391, 494 A. 2d, at 196.   This statement indicates that the "state court decision fairly appears to rest primarily on federal law, or to be interwoven with the federal law . . . ."   *Michigan* v. *Long*, 463 U. S., at 1040.

[8] See *Andresen* v. *Maryland*, 427 U. S. 463, 480 (1976); *Stanley* v. *Georgia*, 394 U. S. 557, 569–572 (1969) (Stewart, J., concurring in result); *Stanford* v. *Texas*, 379 U. S. 476, 481–482, 485 (1965); *Go-Bart Importing Co.* v. *United States*, 282 U. S. 344, 357 (1931); *Marron* v. *United States*, 275 U. S. 192, 195–196 (1927).

search of a suitcase." *United States* v. *Ross*, 456 U. S. 798, 824 (1982).

In this case there is no claim that the "persons or things to be seized" were inadequately described or that there was no probable cause to believe that those things might be found in "the place to be searched" as it was described in the warrant. With the benefit of hindsight, however, we now know that the description of that place was broader than appropriate because it was based on the mistaken belief that there was only one apartment on the third floor of the building at 2036 Park Avenue. The question is whether that factual mistake invalidated a warrant that undoubtedly would have been valid if it had reflected a completely accurate understanding of the building's floor plan.

Plainly, if the officers had known, or even if they should have known, that there were two separate dwelling units on the third floor of 2036 Park Avenue, they would have been obligated to exclude respondent's apartment from the scope of the requested warrant. But we must judge the constitutionality of their conduct in light of the information available to them at the time they acted. Those items of evidence that emerge after the warrant is issued have no bearing on whether or not a warrant was validly issued.[9] Just as the discovery of contraband cannot validate a warrant invalid when issued, so is it equally clear that the discovery of facts demonstrating that a valid warrant was unnecessarily broad does not retroactively invalidate the warrant. The validity of the warrant must be assessed on the basis of the information that the officers disclosed, or had a duty to discover and to disclose, to the issuing Magistrate.[10] On the basis of that

---

[9] Cf. *United States* v. *Jacobsen*, 466 U. S. 109, 115 (1984) (warrantless test of white powder; "[t]he reasonableness of an official invasion of the citizen's privacy must be appraised on the basis of the facts as they existed at the time that invasion occurred").

[10] Arguments can certainly be made that the police in this case should have been able to ascertain that there was more than one apartment on the

information, we agree with the conclusion of all three Maryland courts that the warrant, insofar as it authorized a search that turned out to be ambiguous in scope, was valid when it issued.

## II

The question whether the execution of the warrant violated respondent's constitutional right to be secure in his home is somewhat less clear. We have no difficulty concluding that the officers' entry into the third-floor common area was legal; they carried a warrant for those premises, and they were accompanied by McWebb, who provided the key that they used to open the door giving access to the third-floor common area. If the officers had known, or should have known, that the third floor contained two apartments before they entered the living quarters on the third floor, and thus had been aware of the error in the warrant, they would have been obligated to limit their search to McWebb's apart-

---

third floor of this building. It contained seven separate dwelling units and it was surely possible that two of them might be on the third floor. But the record also establishes that Officer Marcus made specific inquiries to determine the identity of the occupants of the third-floor premises. The officer went to 2036 Park Avenue and found that it matched the description given by the informant: a three-story brick dwelling with the numerals 2–0–3–6 affixed to the front of the premises. App. 7. The officer "made a check with the Baltimore Gas and Electric Company and discovered that the premises of 2036 Park Ave. third floor was in the name of Lawrence McWebb." *Ibid.* Officer Marcus testified at the suppression hearing that he inquired of the Baltimore Gas and Electric Company in whose name the third floor apartment was listed: "I asked if there is a front or rear or middle room. They told me, one third floor was only listed to Lawrence McWebb." *Id.*, at 36–38. The officer also discovered from a check with the Baltimore Police Department that the police records of Lawrence McWebb matched the address and physical description given by the informant. *Id.*, at 7. The Maryland courts that are presumptively familiar with local conditions were unanimous in concluding that the officer reasonably believed McWebb was the only tenant on that floor. Because the evidence supports their conclusion, we accept that conclusion for the purpose of our decision.

ment. Moreover, as the officers recognized, they were required to discontinue the search of respondent's apartment as soon as they discovered that there were two separate units on the third floor and therefore were put on notice of the risk that they might be in a unit erroneously included within the terms of the warrant. The officers' conduct and the limits of the search were based on the information available as the search proceeded. While the purposes justifying a police search strictly limit the permissible extent of the search, the Court has also recognized the need to allow some latitude for honest mistakes that are made by officers in the dangerous and difficult process of making arrests and executing search warrants.[11]

In *Hill* v. *California*, 401 U. S. 797 (1971), we considered the validity of the arrest of a man named Miller based on the mistaken belief that he was Hill. The police had probable cause to arrest Hill and they in good faith believed that Miller was Hill when they found him in Hill's apartment. As we explained:

> "The upshot was that the officers in good faith believed Miller was Hill and arrested him. They were quite wrong as it turned out, and subjective good-faith belief would not in itself justify either the arrest or the subsequent search. But sufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment and on the record before us the officers' mistake was understandable and the arrest a reasonable response to the situation facing them at the time." *Id.*, at 803–804.

While *Hill* involved an arrest without a warrant, its underlying rationale that an officer's reasonable misidentification

---

[11] "Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part. But the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability." *Brinegar* v. *United States*, 338 U. S. 160, 176 (1949).

of a person does not invalidate a valid arrest is equally applicable to an officer's reasonable failure to appreciate that a valid warrant describes too broadly the premises to be searched. Under the reasoning in *Hill*, the validity of the search of respondent's apartment pursuant to a warrant authorizing the search of the entire third floor depends on whether the officers' failure to realize the overbreadth of the warrant was objectively understandable and reasonable. Here it unquestionably was. The objective facts available to the officers at the time suggested no distinction between McWebb's apartment and the third-floor premises.[12]

For that reason, the officers properly responded to the command contained in a valid warrant even if the warrant is interpreted as authorizing a search limited to McWebb's apartment rather than the entire third floor. Prior to the officers' discovery of the factual mistake, they perceived McWebb's apartment and the third-floor premises as one and the same; therefore their execution of the warrant reasonably included the entire third floor.[13] Under either interpretation of the warrant, the officers' conduct was consistent with a reasonable effort to ascertain and identify the place intended to be searched within the meaning of the Fourth Amend-

---

[12] Nothing McWebb did or said after he was detained outside 2036 Park Avenue would have suggested to the police that there were two apartments on the third floor. McWebb provided the key that opened the doors on the first floor and on the third floor. The police could reasonably have believed that McWebb was admitting them to an undivided apartment on the third floor. When the officers entered the foyer on the third floor, neither McWebb nor Garrison informed them that they lived in separate apartments. App. 39–40, 42.

[13] We expressly distinguish the facts of this case from a situation in which the police know there are two apartments on a certain floor of a building, and have probable cause to believe that drugs are being sold out of that floor, but do not know in which of the two apartments the illegal transactions are taking place. A search pursuant to a warrant authorizing a search of the entire floor under those circumstances would present quite different issues from the ones before us in this case.

ment.[14]    Cf. *Steele* v. *United States*, 267 U. S. 498, 503 (1925).

The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

JUSTICE BLACKMUN, with whom JUSTICE BRENNAN and JUSTICE MARSHALL join, dissenting.

Under this Court's precedents, the search of respondent Garrison's apartment violated the Fourth Amendment. While executing a warrant specifically limited to McWebb's residence, the officers expanded their search to include re-

---

[14] Respondent argued that the execution of the warrant violated the Fourth Amendment at the moment when the officers "walked in through that threshold of that house . . . ." Tr. of Oral Arg. 35.    At another point respondent argued that the search was illegal at the point when the police went through Garrison's apartment without probable cause for his apartment.    *Id.*, at 43.    For the purpose of addressing respondent's argument, the exact point at which he asserts the search became illegal is not essential.    Whether the illegal threshold is viewed as the beginning of the entire premises or as the beginning of those premises that, upon closer examination, turn out to be excluded from the intended scope of the warrant, we cannot accept respondent's argument.    It would brand as illegal the execution of any warrant in which, due to a mistake in fact, the premises intended to be searched vary from their description in the warrant.    Yet in this case, in which the mistake in fact does not invalidate the warrant precisely because the police do not know of the mistake in fact when they apply for, receive, and prepare to execute the warrant, the police cannot reasonably know prior to their search that the warrant rests on a mistake in fact.    It is only after the police begin to execute the warrant and set foot upon the described premises that they will discover the factual mistake and must reasonably limit their search accordingly.

Respondent proposes that the police conduct a preliminary survey of the premises whenever they search a building in which there are multiple dwelling units, in order to determine the extent of the premises to be searched.    *Id.*, at 42.    We find no persuasive reason to impose such a burden over and above the bedrock requirement that, with the exceptions we have traced in our cases, the police may conduct searches only pursuant to a reasonably detailed warrant.

spondent's adjacent apartment, an expansion made without a warrant and in the absence of exigent circumstances. In my view, Maryland's highest court correctly concluded that the trial judge should have granted respondent's motion to suppress the evidence seized as a result of this warrantless search of his apartment. Moreover, even if I were to accept the majority's analysis of this case as one involving a mistake on the part of the police officers, I would find that the officers' error, either in obtaining or in executing the warrant, was not reasonable under the circumstances.

## I

The home always has received special protection in analysis under the Fourth Amendment, which protects the "right of the people to be secure in their persons, *houses*, papers, and effects, against unreasonable searches and seizures" (emphasis added). See *Silverman* v. *United States*, 365 U. S. 505, 511 (1961) ("At the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion"). The Fourth Amendment, in fact, was a direct response to the colonists' objection to searches of homes under general warrants or without warrants. See *Chimel* v. *California*, 395 U. S. 752, 761 (1969); *Harris* v. *United States*, 331 U. S. 145, 157–163 (1947) (Frankfurter, J., dissenting). In today's society, the protection of the Amendment of course is extended to the equivalent of the traditional single-family house, such as an apartment. See, *e. g., Ker* v. *California*, 374 U. S. 23, 42 (1963).

The Court has observed that, in determining whether one has an interest protected by the Fourth Amendment, it is appropriate not to limit the analysis to the place in question, for "the Fourth Amendment protects people—and not simply 'areas.'" *Katz* v. *United States*, 389 U. S. 347, 353 (1967). As articulated by Justice Harlan in his *Katz* concurrence, the proper test under the Amendment is whether "a person [has]

exhibited an actual (subjective) expectation of privacy . . . that society is prepared to recognize as 'reasonable.'" *Id.*, at 361. Justice Harlan noted, however, that an answer to the question concerning what protection the Fourth Amendment gave to a particular person always "requires reference to a 'place.'" *Ibid.* In his view, the home would meet this test in virtually all situations. "[A] man's home," he stated, "is, for most purposes, a place where he expects privacy." *Ibid.* The home thus has continued to occupy its special role in Fourth Amendment analysis in the post-*Katz* era. See *Payton* v. *New York*, 445 U. S. 573, 585 (1980) ("[T]he 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed,'" quoting *United States* v. *United States District Court*, 407 U. S. 297, 313 (1972)); *United States* v. *Karo*, 468 U. S. 705, 714–715 (1984) ("Searches and seizures inside a home without a warrant are presumptively unreasonable absent exigent circumstances"); *California* v. *Carney*, 471 U. S. 386, 407–408 (1985) (STEVENS, J., dissenting) ("These places [mobile homes] may be as spartan as a humble cottage when compared to the most majestic mansion . . . but the highest and most legitimate expectations of privacy associated with these temporary abodes should command the respect of this Court"); see also *Steagald* v. *United States*, 451 U. S. 204, 211 (1981); *Coolidge* v. *New Hampshire*, 403 U. S. 443, 477–478 (1971).

The Fourth Amendment also states that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and *particularly describing* the place to be searched, and the persons or things to be seized" (emphasis added). The particularity-of-description requirement is satisfied where "the description is such that the officer with a search warrant can with reasonable effort ascertain and identify the place intended." *Steele* v. *United States*, 267 U. S. 498, 503 (1925). In applying this requirement to searches aimed at residences within multiunit buildings, such as the search in the present case, courts have declared invalid those

warrants that fail to describe the targeted unit with enough specificity to prevent a search of all the units. See, *e. g.*, *United States* v. *Higgins*, 428 F. 2d 232 (CA7 1970); *United States* v. *Votteller*, 544 F. 2d 1355, 1362–1363 (CA6 1976). Courts have used different criteria to determine whether a warrant has identified a unit with sufficient particularity. See, *e. g.*, *United States* v. *Bedford*, 519 F. 2d 650, 655 (CA3 1975) (by name of occupant of apartment), cert. denied, 424 U. S. 917 (1976); *Haynes* v. *State*, 475 S. W. 2d 739, 741 (Tex. Crim. App. 1971) (by directions on how to reach a particular room); see generally 2 W. LaFave, Search and Seizure § 4.5, p. 79 (1978); Crais, Sufficiency of Description of Apartment or Room to be Searched in Multiple-Occupancy Structure, 11 A. L. R. 3d 1330, 1340–1341, § 5 (1967 and Supp. 1986).

Applying the above principles to this case, I conclude that the search of respondent's apartment was improper. The words of the warrant were plain and distinctive: the warrant directed the officers to seize marijuana and drug paraphernalia on the person of McWebb and in *McWebb's* apartment, *i. e.*, "on the premises known as 2036 Park Avenue third floor apartment." App. 9. As the Court of Appeals observed, this warrant specifically authorized a search only of Mc-Webb's—not respondent's—residence. 303 Md. 385, 392, 494 A. 2d 193, 196 (1985).[1] In its interpretation of the war-

---

[1] In reaching its conclusion, the Court of Appeals relied upon a statement by the trial judge that, pursuant to the warrant, only "the third floor apartment of the Defendant McWebb" could be searched. App. 46; 303 Md., at 392, 494 A. 2d, at 196. The majority contends that this reliance was unjustified, for, in making his statement, the trial judge was doing nothing more than rejecting respondent's contention that the warrant was general. *Ante*, at 82–83, n. 4. I fail to see how the interpretation of the Court of Appeals is inconsistent with the majority's understanding of this statement. The trial judge could have been rejecting respondent's argument about a general warrant by observing that the warrant here was limited to a single apartment, McWebb's. Such a view of the trial judge's remark does not contradict his observation that, in procuring and executing

rant, the majority suggests that the language of this document, as well as that in the supporting affidavit, permitted a search of the *entire* third floor. *Ante*, at 82, and n. 4. It escapes me why the language in question, "third floor apartment," when used with reference to a single unit in a multiple-occupancy building and in the context of one person's residence, plainly has the meaning the majority discerns, rather than its apparent and, indeed, obvious signification—one apartment located *on* the third floor.[2] Accordingly, if, as appears to be the case, the warrant was limited in its description to the third-floor apartment of McWebb, then the search of an additional apartment—respondent's—was warrantless and is presumed unreasonable "in the absence of some one of a number of well defined 'exigent circumstances.'" *Coolidge* v. *New Hampshire*, 403 U. S., at 478. Because the State has not advanced any such exception to the warrant requirement, the evidence obtained as a result of this search should have been excluded.[3]

---

the warrant, the officers did not know that there were other apartments on the third floor. App. 41, 46. This lack of knowledge by the officers does not necessarily imply that they believed McWebb's apartment occupied the entire third floor. It could also suggest that, beyond knowing the location of McWebb's apartment, they were unaware of the configuration of the remaining apartments in the building. *Ibid.*

[2] The language in the supporting affidavit similarly suggests that the apartment in question was one located on, but not necessarily occupying entirely, the third floor. *Id.*, at 6 ("During the above mentioned meeting with Informant #222, the Informant stated that he/she knew a subject by the name of 'Red Cross', who was selling Marihuana out of his apartment located at 2036 Park Ave. third floor").

[3] If the officers were confused about the residence of respondent when they encountered him in the third-floor vestibule (see sketch reproduced at 303 Md., at 396, 494 A. 2d, at 199), they might have been justified in detaining him temporarily as an occupant of McWebb's apartment. See *Michigan* v. *Summers*, 452 U. S. 692, 705 (1981); Tr. of Oral Arg. 42. The officers asserted that, upon entering the vestibule, they observed marijuana lying upon a dresser in respondent's bedroom, the door to respondent's apartment being open. App. 24–25. Although it is not entirely clear that the drug could have been seized immediately under the "plain

## II

Because the Court cannot justify the officers' search under the "exceptional circumstances" rubric, it analyzes the police conduct here in terms of "mistake." According to the Court, hindsight makes it clear that the officers were mistaken, first, in not describing McWebb's apartment with greater specificity in the warrant, *ante*, at 85, and, second, in including respondent's apartment within the scope of the execution of the warrant, *ante*, at 86–87. The Court's inquiry focuses on what the officers knew or should have known at these particular junctures. The Court reasons that if, in light of the officers' actual or imputed knowledge, their behavior was reasonable, then their mistakes did not constitute an infringement on respondent's Fourth Amendment rights. In this case, the Court finds no Fourth Amendment violation because the officers could not reasonably have drawn the warrant with any greater particularity and because, until the moment when the officers realized that they were in fact searching two different apartments, they had no reason to believe that McWebb's residence did not cover the entire third floor.

The majority relies upon *Hill* v. *California*, 401 U. S. 797 (1971), for its conclusion that "honest mistakes" in arrests or searches may obviate Fourth Amendment problems. *Ante*, at 87–88. It is doubtful whether *Hill* carries the precedential weight that the majority would ascribe to it. Decided after *Chimel* v. *California*, 395 U. S. 752 (1969), but involving a pre-*Chimel* incident, *Hill* presented a situation where officers, who had probable cause but no warrant to arrest

---

view" exception to the warrant requirement, for this would depend upon whether the officers' "access to the object has some prior Fourth Amendment justification," *Illinois* v. *Andreas*, 463 U. S. 765, 771 (1983), the officers probably would have had probable cause to obtain a search warrant and conceivably could have impounded respondent's apartment while seeking the warrant. See *Segura* v. *United States*, 468 U. S. 796, 810 (1984). Nothing, however, justified the full-scale search of respondent's apartment in which the officers engaged.

Hill, went to Hill's apartment and found Miller instead. 401 U. S., at 799. They mistook Miller for Hill, despite the former's protestations to the contrary, and conducted a search of Hill's apartment, which produced the only substantial evidence later used to convict Hill for robbery. *Id.*, at 801. In deciding that neither the arrest nor the ensuing search constituted a Fourth Amendment violation, the Court was entertaining a challenge made by Hill. The Court here, however, is faced with a Fourth Amendment claim brought by respondent, whose position is comparable to that of Miller. It may make some sense to excuse a reasonable mistake by police that produces evidence against the intended target of an investigation or warrant if the officers had probable cause for arresting that individual or searching his residence. Similar reasoning does *not* apply with respect to one whom probable cause has not singled out and who is the victim of the officers' error. See *Brinegar* v. *United States*, 338 U. S. 160, 176 (1949) ("These long-prevailing standards [of probable cause] seek to safeguard citizens from rash and unreasonable interferences with privacy and from unfounded charges of crime"); cf. *Ybarra* v. *Illinois*, 444 U. S. 85, 91 (1979) ("But, a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person. . . . This requirement [of probable cause] cannot be undercut or avoided by simply pointing to the fact that coincidentally there exists probable cause to search or seize another or to search the premises where the person may happen to be").

Even if one accepts the majority's view that there is no Fourth Amendment violation where the officers' mistake is reasonable,[4] it is questionable whether that standard was

---

[4] Lower court cases, that deal with an exception to the particularity-of-description requirement in a warrant, may support this standard of a "reasonable mistake." Some courts have recognized an exception that applies where, to outward appearances, a building appears to be a single-occupancy structure but contains, in reality, several units, and where

met in this case. To repeat Justice Harlan's observation, although the proper question in Fourth Amendment analysis is "what protection it affords to . . . people, . . . that question requires reference to a 'place.'" *Katz* v. *United States*, 389 U. S., at 361 (concurring opinion). The "place" at issue here is a small multiple-occupancy building. Such forms of habitation are now common in this country, particularly in neighborhoods with changing populations and of declining affluence.[5] Accordingly, any analysis of the "reasonableness" of

---

the officers executing the warrant could not have discovered its multiple-occupancy character despite reasonable efforts. See, *e. g.*, *United States* v. *Davis*, 557 F. 2d 1239, 1247–1248 (CA8), cert. denied, 434 U. S. 971 (1977); 2 W. LaFave, Search and Seizure § 4.5, pp. 79–80 (1978). It appears that, when ruling upon the propriety of the search, the trial judge in this case had such an exception in mind. See App. 45.

It is uncertain, however, whether this exception should apply here, where the officers may not know how many apartments are on a particular floor, but do realize that the building is multiunit. Because the officers are aware that the structure houses other residences besides the target apartment, they should be on notice that they must make an investigation adequate to draw the warrant with sufficient specificity. This means that they must clearly distinguish the target unit from the others in order to avoid infringing upon the Fourth Amendment rights of other occupants of the building. Put another way, if the above exception is to apply, officers drawing a search warrant for a unit of a multiple-occupancy building should be put to a more demanding standard of reasonableness to justify any mistake than is required for those who rely on a reasonable failure to recognize at all the multiunit nature of a structure.

[5] It is not entirely clear from the record what sort of multiple-occupancy building was at issue here, although respondent suggests that it was a single-family home converted into an apartment house. See Tr. of Oral Arg. 41; Brief for Respondent 10. As has been noted by Senator Proxmire:

"It's estimated that there are 7½ million rental units in buildings containing 4 to 50 units. It may be about 15 percent of our population.

"Approximately 4.1 million of those units are in central cities or metropolitan areas. Such units are home to a large number of lower income families and a disproportionate number of minority families." Hearing on Multifamily Housing Rehabilitation before the Subcommittee on Hous-

the officers' behavior here must be done with this context in mind.

The efforts of Detective Marcus, the officer who procured the search warrant, do not meet a standard of reasonableness, particularly considering that the detective knew the search concerned a unit in a multiple-occupancy building. See App. 34. Upon learning from his informant that McWebb was selling marijuana in his third-floor apartment, Marcus inspected the outside of the building. *Id.*, at 35. He did not approach it, however, to gather information about the configuration of the apartments. *Ibid.* Had he done so, he would have discovered, as did another officer on the day of executing the warrant, *id.*, at 13, that there were seven separate mailboxes and bells on the porch outside the main entrance to the house. Although there is some dispute over whether names were affixed near these boxes and bells, *id.*, at 13–14; Suppression Hearing Tr. M2–96 to M2–97, their existence alone puts a reasonable observer on notice that the three-story structure (with, possibly, a basement) had seven individual units. The detective, therefore, should have been aware that further investigation was necessary to eliminate the possibility of more than one unit's being located on the third floor. Moreover, when Detective Marcus' informant told him that he had purchased drugs in McWebb's apartment, App. 6, it appears that the detective never thought to ask the informant whether McWebb's apartment was the only one on the third floor. These efforts, which would have placed a slight burden upon the detective, are necessary in order to render reasonable the officer's behavior in seeking the warrant.[6]

---

ing and Urban Affairs of the Senate Committee on Banking, Housing, and Urban Affairs, 95th Cong., 2d Sess., 1 (1978).

[6] The majority makes much of the fact that Detective Marcus checked with the Baltimore Gas and Electric Company in order to verify McWebb's residence and appeared to be informed that there was only one apartment on the third floor. *Ante*, at 85–86, n. 10. As would appear in the course

Moreover, even if one believed that Marcus' efforts in providing information for issuance of the warrant were reasonable, I doubt whether the officers' execution of the warrant could meet such a standard.   In the Court's view, the "objective facts" did not put the officers on notice that they were dealing with two separate apartments on the third floor until the moment, considerably into the search after they had rummaged through a dresser and a closet in respondent's apartment and had discovered evidence incriminating him, when they realized their "mistake."   *Ante*, at 80, 88–89.   The Court appears to base its conclusion that the officers' error here was reasonable on the fact that neither McWebb nor re-

of the search, when officers discovered separate electric bills for McWebb's and respondent's apartments, App. 28, the information Marcus received was erroneous.   Given that a multiple-occupancy structure was at issue, the detective's inquiry of the gas company should not have relieved him of the obligation to pursue other, less burdensome steps to identify accurately the apartment to be searched, or to dispense with further investigation, such as inquiries directed to other utility companies, the building's owner, or the telephone company.   See, *e. g.*, *United States* v. *Davis*, 557 F. 2d, at 1247 (efforts in providing affidavit justifying search warrant deemed adequate where officers had checked all utilities).   Because respondent had a telephone in his apartment, App. 22—another fact discovered in the course of the search—a brief check with the telephone company would have informed the detective of the other apartment on the third floor.

It is not entirely clear, moreover, that, when Detective Marcus applied for the warrant, he believed that there was only one apartment on the third floor.   In his affidavit to the issuing Magistrate, the detective explained that "no observations of the apartment were conducted due to the fact that it would again be impossible to tell which apartment the individuals would enter."   *Id.*, at 7.   This statement appears to be a reference to long-range, possibly telescopic, observations of McWebb's apartment while the informant purchased drugs from McWebb.   If the detective believed that McWebb occupied the entire third floor of the structure, this remark makes no sense.

The State suggests that further efforts by Detective Marcus may have alerted McWebb to the interest of the investigating officer and thus might have resulted in the destruction of evidence.   Reply Brief for Petitioner 6. It is difficult to understand why a discretely conducted investigation would have had this feared adverse effect.

spondent ever told the officers during the search that they lived in separate apartments. See *ante*, at 88, n. 12.

In my view, however, the "objective facts" should have made the officers aware that there were two different apartments on the third floor well before they discovered the incriminating evidence in respondent's apartment. Before McWebb happened to drive up while the search party was preparing to execute the warrant, one of the officers, Detective Shea, somewhat disguised as a construction worker, was already on the porch of the row house and was seeking to gain access to the locked first-floor door that permitted entrance into the building. App. 13.[7] From this vantage point he had time to observe the seven mailboxes and bells; indeed, he rang *all* seven bells, apparently in an effort to summon some resident to open the front door to the search party. *Id.*, at 13, 15. A reasonable officer in Detective Shea's position, already aware that this was a multiunit building and now armed with further knowledge of the number of units in the structure, would have conducted *at that time* more investigation to specify the exact location of McWebb's apartment before proceeding further. For example, he might have questioned another resident of the building.

It is surprising, moreover, that the Court places so much emphasis on the failure of McWebb to volunteer information about the exact location of his apartment. When McWebb drove up, one of the police vehicles blocked his car and the officers surrounded him and his passenger as they got out. Suppression Hearing Tr. M2–15, M2–56, M2–130 to M2–131. Although the officers had no arrest warrant for McWebb, but only a search warrant for his person and apartment,[8] and al-

---

[7] It is unclear from the record whether by the time of McWebb's arrival this detective had already managed to break in the front door. App. 15.

[8] While the warrant permitted the officers to arrest any persons found in McWebb's apartment who were "then and there engaged in the commission of a crime," App. 9, it did not specifically direct the officers to arrest McWebb.

though they testified that they did not arrest him at that time, *id.*, at M2–14, M2–60,[9] it was clear that neither Mc-Webb nor his passenger was free to leave. See App. 42, Suppression Hearing Tr. M2–157 to M2–158. In such circumstances, which strongly suggest that McWebb was already in custody, it was proper for the officers to administer to him warnings pursuant to *Miranda* v. *Arizona*, 384 U. S. 436 (1966). It would then have been reasonable for the officers, aware of the problem, from Detective Shea's discovery, in the specificity of their warrant, to ask McWebb whether his apartment was the only one on the third floor.[10] As it is, the officers made several requests of and questioned Mc-Webb, without giving him *Miranda* warnings, and yet failed to ask him the question, obvious in the circumstances, concerning the exact location of his apartment. Suppression Hearing Tr. M2–60, M2–131, M2–157.

Moreover, a reasonable officer would have realized the mistake in the warrant during the moments following the officers' entrance to the third floor. The officers gained access to the vestibule separating McWebb's and respondent's apartments through a locked door for which McWebb supplied the key. App. 17. There, in the open doorway to his apartment, they encountered respondent, clad in pajamas and wearing a half-body cast as a result of a recent spinal operation. *Id.*, at 16; Suppression Hearing Tr. M2–104 to M2–105. Although the facts concerning what next occurred are somewhat in dispute, see *id.*, at M2–108, M2–167, it appears that respondent, together with McWebb and the passenger from McWebb's car, were shepherded into McWebb's

---

[9] When the officers confronted McWebb in the street, however, he believed that they had a warrant for his arrest. Suppression Hearing Tr. M2–131.

[10] McWebb, of course, could have refused to answer this question. But, given that the officers had him in custody, they could have pursued other avenues of discovering the exact location of his apartment without any immediate fear of the destruction of evidence.

apartment across the vestibule from his own. Once again, the officers were curiously silent. The informant had not led the officers to believe that anyone other than McWebb lived in the third-floor apartment; the search party had McWebb, the person targeted by the search warrant, in custody when it gained access to the vestibule; yet when they met respondent on the third floor, they simply asked him who he was but never where he lived. *Id.*, at M2–165. Had they done so, it is likely that they would have discovered the mistake in the warrant before they began their search.

Finally and most importantly, even if the officers had learned nothing from respondent, they should have realized the error in the warrant from their initial security sweep. Once on the third floor, the officers first fanned out through the rooms to conduct a preliminary check for other occupants who might pose a danger to them. *Id.*, at M2–63, M2–74, M2–87, M2–167. As the map of the third floor demonstrates, see 303 Md., at 396, 494 A. 2d, at 199, the two apartments were almost a mirror image of each other—each had a bathroom, a kitchen, a living room, and a bedroom. Given the somewhat symmetrical layout of the apartments, it is difficult to imagine that, in the initial security sweep, a reasonable officer would not have discerned that two apartments were on the third floor, realized his mistake, and then confined the ensuing search to McWebb's residence.[11]

Accordingly, even if a reasonable error on the part of police officers prevents a Fourth Amendment violation, the mistakes here, both with respect to obtaining and executing the warrant, are not reasonable and could easily have been avoided.

I respectfully dissent.

---

[11] Having seen the marijuana located upon respondent's dresser in their initial security sweep, the officers could have secured his apartment while seeking a search warrant. See n. 3, *supra.*