F I L E D
**United States Court of Appeals
Tenth Circuit**

**SEP 19 2003**

**PATRICK FISHER**
Clerk

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

FLOYD WILLIAM HORNBACK,

    Defendant - Appellant.

No. 02-2302
(New Mexico)
(D.C. No. CR 01-1712-MCA)

**ORDER AND JUDGMENT**[*]

Before **LUCERO**, **O'BRIEN**, and **TYMKOVICH**, Circuit Judges.

    Floyd W. Hornback entered a conditional plea of guilty to a charge of

possessing an unregistered destructive device in violation of 26 U.S.C. § 5861(d).

He was sentenced to three years probation, 240 hours of community service, and a

$100.00 assessment. He appeals the district court's denial of his motion to

suppress evidence seized during execution of a search warrant, claiming the

warrant did not authorize a search of his property. Exercising jurisdiction under

---

[*] This order and judgment is not binding precedent except under the
doctrines of law of the case, *res judicata* and collateral estoppel. The court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

28 U.S.C. § 1291, we affirm.

*Background*

After a lengthy investigation of Thomas W. Moore for suspected violations of federal firearms laws, Special Agent Brad Devlin of the Bureau of Alcohol, Tobacco and Firearms applied to the United States District Court for the District of New Mexico for a search warrant for Mr. Moore's business, known as the Wild West Trading Post (Trading Post) located in Alamogordo, New Mexico. The court issued a warrant for the Trading Post,[1] together with three other search warrants that targeted Mr. Moore's residence, along with a car wash and storage unit business owned and operated by Mr. Moore.

Agent Devlin testified at the suppression hearing that during his undercover investigation prior to the search he was in the Trading Post two to three times posing as a firearms purchaser. On these occasions, he observed several different rooms and areas that made up the Trading Post. In addition to an area for guns, there was a room occupied by live rattlesnakes, a room dedicated to pornography, several rooms containing military clothing and a jewelry area furnished with glass cases. The jewelry area consisted of two adjoining rooms. The second room was

---

[1]The Wild West Trading Post (Trading Post) consisted of a metal structure on a five acre lot. Also on the lot were four outbuildings (described in the testimony as trailers), abandoned vehicles, and miscellaneous salvage items. The search warrant authorized a search of the entire lot, including all outbuildings.

an office and workshop. Each room had access to the common Trading Post hallway by way of its own sliding glass door. Agent Devlin testified he observed nothing in his investigation to suggest the jewelry area constituted a business owned by an individual other than Mr. Moore. At the time Agent Devlin applied for the search warrant, a sign posted at the entrance gate to the Trading Post announced "Crystal Crafts Lapidary." A similar sign appeared above the jewelry area inside the Trading Post. However, Agent Devlin testified he did not notice either sign during his undercover investigation.

At dawn on February 22, 2001, a special response team (SRT) and search team executed a warrant to search Mr. Moore's residence located in La Luz, New Mexico. After the SRT conducted a protective sweep to assure no threat to the search team, it progressed to its next search target, the Trading Post. The search team remained behind and searched the residence. Mr. Moore was transported from his residence to a command post down the street from the Trading Post. He provided the SRT with keys to the Trading Post in order to prevent a forced entry.

The SRT unlocked the Trading Post with the keys Mr. Moore provided and conducted a protective sweep of the building. The sliding glass doors enclosing the jewelry area were locked, and Mr. Moore's keys did not open either of them. As a result, the team forcibly breached the sliding glass door to the office and

cleared the jewelry area for booby traps[2] and unauthorized persons. This was followed by a sweep of the property by an explosive-sniffing canine and a preliminary walk-through by the search team.[3] The search commenced at approximately 9:15 a.m. Within minutes, agents discovered components of a destructive device in the office portion of the jewelry area, together with literature on how to assemble booby traps and other explosives.[4] Agent Henderson, the head of the search team, immediately sought out Mr. Moore to question him about the discovery.

As the explosive components were being discovered, Agent Devlin was concluding an interview with Mr. Moore at the command post to which Mr. Moore had been transported after he was removed from his residence.[5] At the conclusion of the interview, Mr. Moore informed Agent Devlin the jewelry shop in the Trading Post, Crystal Crafts Lapidary, belonged to Mr. Hornback, as did all of the

---

[2]Agent Devlin had intelligence that militia meetings were held in a secret room in the Trading Post protected by booby-traps.

[3]The preliminary walk-through was filmed on videotape. Agent Henderson, head of the search team, testified that during the preliminary walk-through he did not see a sign over the jewelry area reading "Crystal Crafts Lapidary." The videotape showed the sign was covered with an American flag on the day of the search.

[4]According to the testimony, the items discovered were "designed as components to construct improvised explosive weapons, pipe bombs." (R. Vol. IV at 99).

[5]The interview began at 8:50 a.m. and concluded at 9:33 a.m.

materials within it. Almost coincidentally, Agent Henderson arrived with news of discovering the explosive components in the jewelry area. Mr. Moore informed Agent Henderson the materials belonged to Mr. Hornback. The materials discovered in the search of the jewelry area provided the basis for the charge against Mr. Hornback, and he eventually admitted the materials belonged to him.[6]

Agent Devlin testified as follows: he knew nothing of Mr. Hornback or his relation to the jewelry shop when he applied for the search warrant; he conducted a records check before applying for the search warrant; it revealed the Trading Post compound was owned by Mr. Moore and his wife; had he known of Mr. Hornback's relation to the jewelry shop, he would have informed the magistrate who reviewed the application for search warrant.

Mr. Moore testified he had rented the Crystal Crafts Lapidary space to Mr. Hornback for the past seventeen years. He paid $125.00 per month in rent. Mr. Moore stated he had neither an ownership interest in the jewelry shop nor a key to it. As he put it, Mr. Hornback "has a shop in my shop. " (R. Vol. IV at 120).

---

[6]Mr. Hornback, who did not testify at the suppression hearing, appeared at the Moore residence between 9:00 a.m. and 10:00 a.m. He was aware of the simultaneous searches in progress at the Moore residence and the Trading Post. He registered no objection to the search of the Trading Post. The only concern he expressed was how he might later lay claim to his firearms which were located within the Trading Post. Although he mentioned to one of the agents that he did jewelry work, he never claimed he operated a jewelry business out of the Trading Post.

Although Mr. Hornback had several signs outside his shop, Mr. Moore could not recall what any of them said. Mr. Hornback had a sign at the entrance gate to the five acre Trading Post property reading "Crystal Crafts Lapidary." Mr. Moore also testified Mr. Hornback could not access his jewelry shop except through the Trading Post, to which Mr. Hornback did not have a key. He testified his Trading Post business card advertised "cars, new, old, junk, jewelry, guns, new, used. It just had everything on it." (R. Vol. IV at 138). The Trading Post also doubled as a pawn shop. An advertisement in the 2000-2001 phone book for the pawn business included an announcement that Mr. Moore would buy and sell jewelry. Even so, in testimony Mr. Moore insisted his jewelry operation was distinct from Mr. Hornback's business.

Mr. Moore claimed Agent Devlin knew before the search that Mr. Hornback operated the jewelry shop. Mr. Moore testified he personally told Agent Devlin, when the agent was in the Trading Post in his undercover capacity, that Mr. Hornback owned the jewelry store. Mr. Moore also claimed that on the day of the search, Agent Devlin asked him if he had a key to the jewelry shop, to which Mr. Moore responded he did not. Agent Devlin denied both conversations.

When the SRT conducted its protective sweep of the Trading Post compound, they removed Lucas Moore, Thomas Moore's son, from one of the trailers. Agent Henderson testified he escorted Lucas Moore off the property after

-6-

he was removed from the trailer, and Lucas Moore never returned to the property until the search team cleared. Other agents verified Lucas Moore was not on the Trading Post property during the search. To the contrary, Lucas Moore testified that after he was removed from the trailer an agent brought him up to the Trading Post at around 9:00-9:30 a.m. to assist in locating keys to open several safes. He claimed that inside the Trading Post he encountered a man in a business suit. He told this man the jewelry shop belonged to Mr. Hornback and had nothing to do with the Trading Post. Moments later, the agents forcibly breached the glass sliding door to the jewelry shop. At this point, Lucas Moore claims he told the agents the jewelry shop belonged to Mr. Hornback.

## *Issues Presented*

Mr. Hornback argues: (1) the search warrant for the Trading Post was invalid because it failed to particularly describe the place to be searched and impermissibly included his business; and (2) the agents executing the warrant acted in an objectively unreasonable manner by failing to recognize, before forcibly breaching the door to his jewelry shop, that it was a separate business unrelated to the Trading Post.

## *Standard of Review*

In reviewing a denial of a motion to suppress, we consider the totality of the circumstances and view the evidence in a light most favorable to the

government.  While we accept the district court's factual findings unless clearly erroneous, reasonableness under the Fourth Amendment is ultimately a question of law reviewable de novo.  *United States v. Long,* 176 F.3d 1304, 1307 (10th Cir. 1999).

**Discussion**

*Validity of the Search Warrant - Particularity Requirement*

Mr. Hornback argues the search warrant was facially overbroad and invalid because it authorized a search of his jewelry shop when there was only probable cause to search the Trading Post.[7]

The Fourth Amendment requires that a search warrant particularly describe the place to be searched.  "[T]he discovery of facts demonstrating that a valid warrant was unnecessarily broad does not retroactively invalidate the warrant. The validity of the warrant must be assessed on the basis of the information that the officers disclosed, or had a duty to discover and to disclose, to the issuing

---

[7]Mr. Hornback also complains the search warrant was overbroad and invalid because it authorized a search of the outbuildings, abandoned vehicles and salvage items scattered on Mr. Moore's five acre lot.  Because no evidence was seized from any of these locations and used against Mr. Hornback, we confine our review to his claim the warrant was overbroad and invalid insofar as it authorized a search of his jewelry shop.  At the same time, we recognize intentionally seeking an overbroad warrant could be evidence Agent Devlin acted unreasonably in gathering information to include in his application for search warrant.  But, that is a credibility issue apparently considered by the district court in its assessment of the testimony.

Magistrate." *Maryland v. Garrison*, 480 U.S. 79, 85 (1987). In *Garrison*, officers obtained a search warrant for an apartment on the third floor of a building. *Id.* at 80. It was not until their search was in progress and they had already seized narcotics from an apartment occupied by a person not named in the search warrant that the officers realized there were actually two apartments on the third floor. *Id.* at 81. Before applying for the warrant, the officers made attempts to establish who occupied the third floor of the building. These attempts included an inquiry to the local utility company to ascertain in whose name the utilities to the third floor were registered. *Id.* at 85, n.10. Despite these efforts, the officers were mistaken in their belief there was only one occupant of the third floor. *Id.* at 80. "The question is whether that factual mistake invalidated a warrant that undoubtedly would have been valid if it had reflected a completely accurate understanding of the building's floor plan." *Id.* at 85. Concluding the officers who applied for the warrant acted in an objectively reasonable manner in gathering information before presenting it to the magistrate, the Supreme Court found the warrant valid. *Id.* at 81. "[T]he warrant, insofar as it authorized a search that turned out to be ambiguous in scope, was valid when it issued." *Id.* at 86.

The facts here are analogous to those presented in *Garrison.* Agent Devlin visited the Trading Post property and determined it was owned by Mr. Thomas Moore and his wife. The district court, in upholding the validity of the Trading

Post warrant, applied the *Garrison* test and concluded, "the officers who obtained the warrant had no knowledge that the area in question, the jewelry room in question, was under the control of and ownership of, or at least rented to the defendant.  There was no knowledge developed during this hearing on the part of the officers to that effect."  (R. Vol. IV at 209).

The only evidence that Agent Devlin intentionally withheld from the magistrate knowledge of Mr. Hornback's ownership of the jewelry shop came from Mr. Thomas Moore. "The credibility of witnesses, the weight to be given evidence, and the reasonable inferences drawn from the evidence fall within the province of the district court." *Long,* 176 F.3d at 1307.  The district court specifically discredited Mr. Thomas Moore's testimony, and credited the testimony of the agents.  We find nothing to suggest this was clear error.

We likewise agree with the district court that there is no evidence to suggest Agent Delvin ought to have investigated whether the jewelry shop was independently owned.  Agent Devlin never noticed the signs reading "Crystal Crafts Lapidary" posted at the entrance gate to the Trading Post and over the jewelry shop.   Mr. Moore himself could not recall the content of the signs outside the jewelry shop.   In any event, Agent Devlin's failure to notice the  signs is inconsequential, given the fact that  Mr. Moore dealt personally in jewelry trades at the Trading Post.  Any sign advertising a jewelry business would not have put

the agent on inquiry notice that another individual might have a separate jewelry business within the Trading Post. We conclude the United States acted in an objectively reasonable manner in gathering information to include in its application for search warrant, and the warrant is valid.

*Unreasonable Execution of the Warrant*

Mr. Hornback next contends that even if the warrant was valid, the execution of the warrant was unreasonable because at the time the sliding glass door to the jewelry shop was forcibly breached and the shop searched, the agents knew or reasonably should have known the jewelry shop did not belong to Mr. Moore.

When officers executing a search warrant realize its overbreadth in describing the premises to be searched, the search of the premises beyond the proper scope of the warrant must cease. *Garrison*, 480 U.S. at 86. "While the purposes justifying a police search strictly limit the permissible extent of the search, the Court has also recognized the need to allow some latitude for honest mistakes that are made by officers in the dangerous and difficult process of making arrests and executing search warrants." *Id.* at 87. "[T]he validity of the search . . . depends on whether the officers' failure to realize the overbreadth of the warrant was objectively understandable and reasonable." *Id.* at 88.

The facts available to the SRT and search team before the search was

executed were: 1) there was a sign at the entrance gate to the Trading Post property that read "Crystal Crafts Lapidary;" and 2) the SRT had obtained keys from Mr. Moore to unlock the Trading Post, but the keys did not unlock the sliding glass doors to the jewelry area.[8]  As previously noted, we attribute negligible weight to the information conveyed by the sign.[9]

Mr. Hornback argues it was not objectively understandable and reasonable for the SRT to have failed to stop at the threshold of the jewelry shop when they realized the keys Mr. Moore had provided did not open its doors.  The question presented is whether the agents should have made further inquiry as to why the keys did not open the jewelry shop doors.  Such an inquiry would surely have led to a realization the jewelry shop belonged to Mr. Hornback.

We conclude the SRT was under no obligation to confer further with Mr. Moore (who was not at the Trading Post at the time) regarding the keys to the

---

[8]The district court found Lucas Moore's testimony about being on the scene of the search and notifying the agents of Mr. Hornback's ownership of the jewelry shop "somewhat more credibl[e]" than his father's.  (R. Vol IV at 210-11). However, the court concluded even if his testimony was true (the district court characterized it as "rather indefinite" (*Id.* at 211)), the information was not conveyed to the agents prior to the breach of the sliding glass door and seizure of the explosive component materials.  On the other hand, the district court found the testimony of the officers involved in the search to be credible.  (*Id.* at 210). We see no reason to disturb these findings.

[9]An American flag obscured the "Crystal Crafts Lapidary" sign over the jewelry shop on the day of the search, so that sign failed altogether as an indicator to the SRT and search team of a possible separate business.

Trading Post and the jewelry area. Mr. Moore had not informed the agents when he turned over his keys that they did not open the enclosure of a tenant. While he was not obligated to do so, he was in a position to reveal this information. On the other hand, the agents were acting under a warrant issued in the reasonable belief the Trading Post property was entirely under Mr. Moore's dominion.[10] The agents might have reasonably believed Mr. Moore took extra precautions in locking a room housing jewelry. A reasonable explanation for the failure of the keys to open the jewelry shop was that Mr. Moore had simply neglected to turn over the key to that specific enclosure. Under the circumstances, we conclude the agents' failure to realize the over breadth of the warrant was objectively understandable and reasonable.

*Conclusion*

Detecting no clear error in the district court's factual findings, we concur in its legal conclusions, and AFFIRM its order denying suppression of the evidence.

**Entered by the Court:**

**TERRENCE L. O'BRIEN**
United States Circuit Judge

---

[10]We also note Mr. Hornback, in his conversation with the agent at the Moore residence, expressed no misgivings that the search of the Trading Post, then in progress, might spill over into property he claims as his own.