106 F.3d 402
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee
v.
Eric Lafranz CATO, Defendant-Appellant
 No. 94-5837.
 United States Court of Appeals, Sixth Circuit.
 Dec. 23, 1996.
As Amended April 8, 1997.
 
 On Appeal from the United States District Court for the Western District of Kentucky, No. 93-00108; Edward H. Johnstone, Judge.
 W.D.Ky.
 VACATED.
 
 
 1
 Before: MERRITT and COLE, Circuit Judges; DUGGAN, District Judge*.
 
 
 2
 DUGGAN, District Judge.
 
 
 3
 On October 25, 1993, a two-count indictment was issued against defendant charging him with possession with intent to distribute cocaine base, in violation of 21 U.S.C. § 841(a)(1), and with a violation of 18 U.S.C. § 924(c)(1). On March 11, 1994, defendant was convicted as charged. Defendant's convictions were based on evidence seized pursuant to a search warrant executed on April 17, 1993 at defendant's residence.
 
 
 4
 On appeal, defendant challenges the district court's orders denying his motion to suppress and denying his request for an in camera interrogation of the confidential informant (CI) who provided information contained in the subject search warrant. In a supplemental pro se brief, defendant argues that his conviction under 18 U.S.C. § 924(c)(1) should be set aside pursuant to Bailey v. United States, --- U.S. ----, 116 S.Ct. 501 (1995).[1]
 
 Background
 
 5
 On April 16, 1993, Detective Jeff Roehrs (Det. Roehrs) of the Louisville Division of Police, Street Crimes Unit, received information from a CI of drug trafficking activity at 1304 South 6th Street in Louisville, Kentucky. In an affidavit filed in support of a search warrant to search the premises, Det. Roehrs averred in pertinent part:[2]
 
 
 6
 ... there is reasonable and probable grounds to believe and affiant does believe that there is now on the premises known and numbered as 1304 S. 6th St. Apt 3 Louisville Jefferson County Kentucky and more particularly described as follows: a three story apartment house that sets on the west side of 6th St. and is the second house south of Ormsby Av [illegible] The house is brown in color and has a large front porch across the front. The numbers 1304 are located on the north side of the front door. Apartment three is on the third floor and has a white door with a black 3 on it.[3]
 
 
 7
 * * *
 
 
 8
 * * *
 
 
 9
 On the 16th day of April, 19 93, at approximately 1800 p.m., affiant received information from/observed: A confidential and reliable informant who is know[n] to the affiant and has provided information, which has proven accurate and truthful and resulted in past arrest. This informant states he/she knows two individuals a B/M 5-9 200 and a B/F 5-5 130 in her 30's who resides at 1304 S. Six[th] St Apt # 3. My informant stated this B/M and B/F were selling cocaine from this apt. My informant went on to say that he/she had been in the apt several times in the past and observed the B/M and B/F selling bindles [sic] of cocaine to unknown individuals who were admitted to the dwelling. My informant went on to say he/she had been in the apt in the last 48 hours and seen a large amount of cocaine package for sale. Informant said that the B/M told him what ever he need[ed] they had it.
 
 
 10
 Acting on the information received, affiant conducted the following independent investigation: Affiant conducted a surveillance on 1304 S 6th ... My informant states apt. 1 is vacant and apt. # 2 in this residence is a target of a warrant.[4] Informant made a controlled buy from apt # 2. in the last 48 hours. While there was told if he wanted a larger amount of cocaine he would have to go to apt. # 3. Informant then went to apt # 3 and observed a large amount of cocaine package for sale.
 
 
 11
 (J.A. at 28-29) (emphases added).
 
 
 12
 At approximately 1:30 a.m. on April 17, 1993, Judge Richard Fitzgerald signed Dets. Roehrs' and Knight's search warrants. The subject warrant provided in pertinent part:[5]
 
 
 13
 ... there is probable and reasonable cause for the issuance of this Search Warrant as set out in the affidavit attached hereto and made a part hereof as if fully set forth herein; you are commanded to make immediate search of the premises known and numbered as 1304 So. 6th Street Apt. # 3 Louisville Jefferson County Kentucky.
 
 
 14
 and more particularly described as follows: A three story apartment house that sits on the west side of 6th Street and is the second house south of Ormsby Ave. The house is brown in color and has a large front porch across the front. The numbers 1304 are located on the north side of the front door. Apartment # 3 is on the third floor and has a white door with a black "3" on it....
 
 
 15
 * * *
 
 
 16
 * * *
 
 
 17
 and/or on the person or persons of: a B/M 5-9 200 and B/F 5-5 130 in her 30's....
 
 
 18
 (J.A. at 30) (emphases added). At approximately 2:30 a.m., two search teams (one led by Det. Roehrs, the other by Det. Knight) entered the building to execute the warrants. Pursuant to Det. Roehrs' warrant, the police seized drugs, a .380 pistol, a Motorola pager, plastic baggies and money from defendant's residence, apt. # 4.[6]
 
 
 19
 Defendant filed a motion to suppress the evidence seized pursuant to that warrant, arguing that the warrant failed to describe with particularity the place to be searched. On December 20, 1993, the trial court conducted a hearing on defendant's motion, during which Det. Roehrs testified that there was a vacant apartment with a "wide open" door on the second floor of the building to the right of the stairs. (J.A. at 386). He then testified, "[w]e come to find out later that it was actually number 3, but there was no number at the time we went up there." Id. (emphasis added). He testified that a couple of officers went into apt. # 3 to check it out, to "make sure nobody was in there because we didn't know if it was part of this apartment or not.[7] And after we got up here somebody there said there was a 3, an outline of a 3 on this door. I said, well, the apartment we want is on the third floor." Id. at 387 (emphasis added). Det. Roehrs then testified that the CI "must have been wrong" when he told him that the suspect apartment had a black "3" on a white door. Id. at 392. Det. Roehrs indicated that the CI told him that the CI had been to the third floor apartment the day of the search. Id. at 396. On January 5, 1994, the court issued an order denying defendant's motion.
 
 
 20
 After substituting defense counsel, defendant was allowed to reargue his suppression motion. On March 10, 1994, as a supplement to the December 20, 1993 hearing, the trial court heard additional testimony from Det. Roehrs, who testified that allegations in the affidavit in support of the search warrant were not completely accurate because the actual apartment number intended to be searched was number 4, not number 3. He testified that the CI gave inaccurate information regarding the number on the apartment door. In executing the challenged search warrant, some of the officers on Det. Roehrs' team entered apt. # 3 before entering defendant's apartment.[8] Det. Roehrs testified that the door to apt. # 3 was open at the time. Roehrs acknowledged that the warrant commands the officers to search apt. # 3. Id. at 155. See J.A. at 226 (in going into apt. # 3, the police were following the warrant's dictates).
 
 
 21
 Roehrs testified that apt. # 3 did not have a black "3" on the door, although the CI told him that the apartment had a black "3" on it. Id. at 155-56. On cross-examination, however, Roehrs testified that the officers who entered apt. # 3 saw "a little outline of a 3". Id. at 167. Roehrs realized that the warrant contained a misdescription "when [they] went in and they said that there was a number 3, outline of a 3 back here on the door and I said that's not the one we want, our apartment is on the third floor." Id. at 168. The trial court again denied defendant's motion to suppress.
 
 
 22
 At trial, Det. Roehrs testified that as the search unit entered the building, they "knew" that the subject apartment was on the third floor, see J.A. at 205, although there was no apt. # 3 on the third floor. Id. at 225. He then testified that some officers looked around apt. # 3 prior to searching defendant's apartment to see if anyone was in the apartment and that they only remained in there for one to two minutes. When asked if the officers entered apt. # 3 because of its identification on the warrant, Roehrs responded that they were instructed to go down the hallway and secure anything, so naturally they checked inside any open doors.
 
 
 23
 Defendant then elicited testimony from Dets. Knight and Roehrs on the suppression issue. When asked if the information in Roehrs' affidavit was correct, Det. Knight testified:
 
 
 24
 [t]he only thing I can remember that the informant stated and to the best of my knowledge is that he was discussing the apartment upstairs in the residence at the location, the 1304 South 6th, stated he knew the apartment was on the third floor and I believe there was a discussion between myself and Detective Roehrs and the informant about whether there was a name on this apartment and I believe the informant stated he thought there was a number 3, but he wasn't sure. [ ] And he knew that this apartment was on the third floor, a flight up the stairs from Apartment # 2.
 
 
 25
 Id. at 353. He further testified that the CI told them (Dets. Knight and Roehrs) that he had been to the third floor apartment, he then modified his testimony stating that he could not remember if the CI said he had been in the apartment or "just had knowledge of it." Id. at 354.
 
 
 26
 Roehrs testified that the CI told him that he had been to the third floor apartment where he had observed drug transactions. Id. at 359-60.
 
 
 27
 On March 11, 1994, the evening of defendant's convictions, defense counsel Thomas Clay,[9] his wife, co-defense counsel Catherine Rao, and Assistant Commonwealth Attorney Keith Kamenish, Clay's friend of seven years and Rao's fiance at the time,[10] met for dinner. On May 27, 1994, defendant moved ex parte for an in camera interrogation of the CI based on a conversation attorneys Clay and Rao had with Kamenish during this dinner. On June 6, 1994, the trial court conducted a hearing on defendant's ex parte motion to determine if an in camera interview was warranted. At that hearing, Kamenish testified that he had no reason to believe that Det. Roehrs made a misstatement in the affidavit underlying the subject warrant. (J.A. at 405). Kamenish then read the following paragraph from an affidavit submitted by attorney Clay:
 
 
 28
 Mr. Kamenish advised me that ... in an interview Detective Roehers [sic] testified the informant never did go in the defendant's apartment on third floor of this residence and had never personally observed any drugs in the defendant's apartment.
 
 
 29
 (J.A. at 406). Kamenish denied making that statement to Clay or to anyone else. Kamenish indicated, however, that Det. Roehrs stated that "there was a problem with the warrant because of the apartment numbers." Id. at 410. When questioned by Clay as to what Kamenish had told Clay, Kamenish testified:
 
 
 30
 ... You [Clay] stated that in the search warrant affidavit [Det. Roehrs] stated that the [CI] had gone to the third floor apartment at which I [Kamenish] stated, "Well, that's not what he told me in my conferences with him." I stated that he had told me that there was two apartments at issue, that he had made a controlled buy through an informant on the lower apartment and that while the informant was present there he was told by the other Detroit boys that if he needed more cocaine he could go to the third floor.
 
 
 31
 Id. at 414. According to Kamenish, Det. Roehrs did not supply him with information on whether the CI had ever been to the third floor apartment. Id.
 
 
 32
 Det. Roehrs denied that he told Kamenish that the CI had never actually been to the third floor apartment or personally observed drugs there. (J.A. at 361-62). He testified that a few days after he arrested defendant, he asked Kamenish if there would be a problem with the search warrant because it referenced apt. # 3 "when we found out it was actually Apartment 4". Id. at 365 (emphasis added). He again testified that the CI advised him and Det. Knight that he had been to the third floor apartment. Id. at 366-67. On June 8, the trial court issued an order denying defendant's motion to conduct an in camera interview of the CI "for the reasons stated in the record of the official court reporter." (J.A. at 130).[11] Defendant was then sentenced to 144 months in prison.
 
 Discussion
 Validity of the Search Warrant
 The Fourth Amendment provides:
 
 33
 The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.
 
 
 34
 U.S. Const. amend. IV (emphasis added). "The fourth amendment requires warrants to 'particularly describe the place to be searched....' " United States v. Blakeney, 942 F.2d 1001, 1026 (6th Cir.), cert. denied, 502 U.S. 1008 (1991). See Maryland v. Garrison, 480 U.S. 79, 84, 107 S.Ct. 1013, 1016, 94 L.Ed.2d 72 (1987). "The standard of review for this Court in determining whether a search warrant describes the place to be searched with sufficient particularity is a de novo review." United States v. Gahagan, 865 F.2d 1490, 1496 (6th Cir.), cert. denied, 492 U.S. 918 (1989). In Gahagan, this Court created a two-part test for determining whether a description in a warrant is sufficient to satisfy the particularity requirement:
 
 
 35
 (1) whether the place to be searched is described with sufficient particularity as to enable the executing officers to locate and identify the premises with reasonable effort; and (2) whether there is reasonable probability that some other premises may be mistakenly searched.
 
 
 36
 Id. at 1497.
 
 
 37
 "For purposes of satisfying the Fourth Amendment, searching two or more apartments in the same building is no different than searching two or more completely separate houses." See United States v. Shamaeizadeh, 80 F.3d 1131, 1137 (6th Cir.1996). In Garrison, supra, the search warrant at issue authorized the search of "premises known as 2036 Park Avenue third floor apartment." 480 U.S. at 80, 107 S.Ct. at 1014. At the time the Garrison officers applied for the warrant, they believed that only one apartment existed on the third floor, when, in fact, the floor was divided into two apartments. Id. Before the executing officers became aware that there were two separate apartments, however, they discovered contraband in Garrison's apartment. Id. Once the officers became aware that two apartments existed, they discontinued the search. Id. at 81, 107 S.Ct. at 1015. In resolving Garrison's challenge to the warrant, the Garrison Court concluded that the warrant's validity should be determined "not in light of facts discovered upon execution of the search warrant, but rather 'in light of the information available to the officers at the time they acted.' " Id. at 85, 107 S.Ct. at 1017. The officers in Garrison recognized that "they were required to discontinue the search of [the defendant's] apartment as soon as they discovered that there were two separate units on the third floor and therefore were put on notice of the risk that they might be in a unit erroneously included within the terms of the warrant." Id. at 87, 107 S.Ct. at 1018.
 
 
 38
 In the present case, the police entered apt. # 3, the apartment specifically identified on the warrant, before searching defendant's apartment. In fact, those officers who entered apt. # 3 alerted Det. Roehrs that the door to apt. # 3 contained a black outline of the number "3" as described in the affidavit. Det. Roehrs testified that he realized at that point that the warrant contained inaccurate information. Despite this realization and the officers' comments, Det. Roehrs led a team of officers into defendant's apartment where they found evidence which led to the convictions underlying this appeal. Based on the Supreme Court's dictate in Garrison, the police in this case were required to discontinue the search of the premises once they realized that they might be in a unit erroneously included within the terms of the warrant.
 
 
 39
 In support of its argument that the search warrant should be upheld, the government relies on the Fourth Circuit's decision in United States v. Owens, 848 F.2d 462 (4th Cir.1988). In Owens, the search warrant identified the premises to be searched as "3901 Edgewood Road, Apartment 336, Baltimore, Maryland". Id. at 462. Prior to applying for the warrant, utility company records were reviewed to determine the exact number of the defendant's apartment; the records listed "336" as the number. Id. at 463. Prior to the warrant's execution, an individual involved in the drug operation admitted that he had recently delivered a shipment of drugs to defendant's apartment, which was on the right side of the third floor. Id. Upon executing the warrant, the officers discovered two apartments on the third floor, neither of which was numbered "336". Id. The officers then searched the apartment on the right side, which was numbered "324". Id.
 
 
 40
 In upholding the validity of the search, the Court found that of the two apartments on the floor, only one appeared to be occupied as described in the affidavit, id. at 465, and the individual's statement confirmed the officers' belief that the apartment to be searched was on the right side. Id. Under those circumstances, the Court stated that "there was no probability of a mistaken search, and we cannot conclude that the inaccurate address in the warrant should operate to invalidate the search." Id. (citing United States v. Clement, 747 F.2d 460, 461 (8th Cir.1984)).
 
 
 41
 In Clement, the search warrant described the premises to be searched as "the apartment of [defendant], apartment No. 4 at 3300 Irvine Avenue". 747 F.2d at 461. The officers searched apartment No. 3, however, where defendant was residing, an apartment adjacent to apartment No. 4. Id. When the officers arrived at the apartment building, they immediately went to apartment No. 3 and conducted a search there. Id. In upholding the validity of the search warrant, the Clement Court noted that the officer had been to the apartment building on several occasions and knew where the defendant's apartment was located. In fact, the day before the warrant issued, the officer spoke to the defendant in his apartment; the warrant specifically named the defendant's residence; and when the officers arrived to execute the warrant, they immediately went to the defendant's apartment. Id. Under those facts, the Court held that it could not conclude "that the inaccurate address in the warrant should operate to invalidate the search." Id.
 
 
 42
 Unlike Owens and Clement where there was "no probability of a mistaken search", in the present case, a mistaken search was not only probable but, in fact, took place. Unlike the affiant in Clement who had been inside the building on several occasions, including the day before the search, who specifically named the defendant in the warrant and who identified the defendant's residence as the place to be searched. Det. Roehrs had never been inside the building prior to executing the search warrant and did not specifically identify defendant in the affidavit or warrant. More important, in Clement, the officers immediately went to the defendant's apartment despite the numerical error in the warrant; whereas, in the present case, the officers searched apt. # 3 prior to going up the stairs and searching apt. # 4, defendant's residence. Det. Roehrs testified that officers in his search unit noticed and alerted Det. Roehrs to the fact that a black outline of "3" appeared on the second floor apartment. (J.A. at 167, 387). Det. Roehrs realized the warrant contained a misdescription when the officers said there was a number "3" on the second floor apartment. Id. at 168. Under Garrison, therefore, the officers should have discontinued the search as soon as they discovered that two separate units were identified on the warrant and were therefore put on notice of the risk that they might erroneously search a unit. 480 U.S. at 87, 107 S.Ct. at 1018.
 
 
 43
 The government argues that because no one was living in apt. # 3 at the time of the search, no "search" of that apartment took place, and therefore the officers' entry into that apartment was for the purpose of performing a "protective sweep" to see if anyone lived there. The actions of the officers indicate otherwise; they entered and "searched" apt. # 3 because it was specifically identified in the warrant they were executing. Had apt. # 3 been occupied, the officers' search of that unit would have had more damaging results. The fact that apt. # 3 was vacant at the time of the search should not insulate the officers from their realization and recognition that one unit would be erroneously searched under the terms of the warrant. Because the warrant did not describe with sufficient particularity the premises to be searched, the officers entered two separate apartments and in this Court's opinion "searched" two separate apartments. The Court finds, therefore, that the search warrant at issue violates the particularity clause of the Fourth Amendment. Any evidence seized as a result of that warrant must be suppressed, unless an exception to the exclusionary rule applies.
 
 
 44
 Leon Good-Faith Exception to the Exclusionary Rule
 
 
 45
 The government argues that even if this Court finds that the search warrant violates the particularity requirement of the Fourth Amendment, this Court should still uphold the trial court's decision under the "good faith exception" of United States v. Leon, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984).[12] "In Leon, the Supreme Court held that the exclusionary rule 'should be modified so as to not bar the admission of evidence seized in reasonable, good-faith reliance on a search warrant that is subsequently held to be defective.' " United States v. Johnson, 22 F.3d 674, 681 (6th Cir.1994) (citing Leon, 468 U.S. at 905, 104 S.Ct. at 3411). See United States v. Czuprynski, 46 F.3d 560, 562 (6th Cir.1995).
 
 
 46
 The Court [in Leon ] noted four specific situations where the good faith reliance exception would not apply: (1) where the supporting affidavit contained knowing or reckless falsity; (2) where the issuing magistrate failed to act in a neutral and detached fashion, and served merely as a rubber stamp for the police; (3) where the supporting affidavit did not provide the magistrate with a substantial basis for determining the existence of probable cause, or in other words, where the warrant application was supported by nothing more than a bare bones' affidavit; and (4) where the officer's reliance on the warrant was neither in good faith nor objectively reasonable.
 
 
 47
 United States v. Leake, 998 F.2d 1359, 1366 (6th Cir.1993) (internal citations and quotations omitted) (emphasis in original). Based on the actions of the officers as outlined above, the Court believes that the Leon exception should not apply. The officers' reliance on the warrant in searching apt. # 4 after realizing the misdescription in the warrant was not in good faith and not objectively reasonable. Although Det. Roehrs believes that he "knew" where to search (the third floor apartment) despite the CI's information that the suspect apartment contained a black "3" on an all-white door, the executing officers with him did not know the particular apartment to be searched, as evidenced by their search of apt. # 3 on the second floor. Therefore, the government cannot argue that the police acted in good faith and in reasonable reliance on the warrant, when, in fact, they realized the warrant's error before searching apt. # 4 where the evidence at issue was seized. Where a warrant contains a significant error in its description of the place to be searched, police do not act in good faith when they decide to search a dwelling other than the one described. Such a practice would lead to random, general searches as police try to guess which dwelling may have been intended by their informant.
 
 
 48
 For the reasons set forth above, the evidence seized pursuant to the search warrant must be suppressed.
 
 
 49
 Defendant's convictions are therefore VACATED.
 
 
 
 *
 The Honorable Patrick J. Duggan, United States District Judge for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 Defendant contends that the evidence introduced at trial was insufficient to support a conviction under the "use" prong of the statute. Since this issue was raised by defendant pro se in a supplemental brief and the Court did not request a response by the appellee and has not had the benefit of full briefing on this point, the Court declines to address this issue
 
 
 [2]
 The form language is represented by italics
 
 
 [3]
 It is undisputed that the building located at 1304 South 6th Street is an apartment building containing four apartments one on the first floor (apt. # 1), two on the second floor (apts. # 2 & # 3) and one on the third floor (apt. # 4). It is also undisputed that apt. # 3 was vacant and burned out on April 16, 1993, and that defendant lived on the third floor in apt. # 4
 
 
 [4]
 Based on information from the same CI that a cocaine purchase occurred in apt. # 2 on the second floor, a second search warrant was sought by Detective James Knight for apt. # 2 in the same building
 
 
 [5]
 See n. 2, supra
 
 
 [6]
 All seized items were offered as evidence in defendant's criminal trial
 
 
 [7]
 At the time of the search, Det. Roehrs did not know if the vacant, burned-out apt. # 3 was "a part of [apt. #] 2 or what it was". (J.A. at 394). Apt. # 2 was the subject of Det. Knight's, not Det. Roehrs', warrant
 
 
 [8]
 Det. Roehrs testified that the officers looked in and around apt. # 3. (J.A. at 160-61)
 
 
 [9]
 Attorney Clay is defendant's counsel on appeal
 
 
 [10]
 Kamenish and Rao have since married
 
 
 [11]
 The trial court's "reasons" were that "[t]he Court has heard evidence from ... Kamenish, and from Detective Roehrs. Having considered their testimony and the entire record [which included Clay's affidavit], the Court will overrule the motion for an in camera interrogation." (J.A. at 382)
 
 
 [12]
 Judged Johnstone did not address Leon in denying defendant's motion