[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 15-15270
Non-Argument Calendar
_____

D.C. Docket No. 1:14-cv-00502-KD-M


VINCENT WHITE,

Plaintiff-Appellee,

versus

JOHN MCLAIN,

Defendant-Appellant,

JOHNNY THORNTON, SR., et al.,

Defendants.

_____

Appeal from the United States District Court
for the Southern District of Alabama
_____

(April 19, 2016)

Before ED CARNES, Chief Judge, JORDAN, and JULIE CARNES, Circuit
Judges.

PER CURIAM:

Vincent White sued several members of the Mobile County Sherriff's Office after they burst into his home without legal justification.  The deputies, who had mistaken White's house for the one specified in a warrant, all asserted qualified immunity as a defense to White's claim that they had violated his Fourth Amendment rights.  The district court held that qualified immunity insulated all but one of them from that claim.  The only officer denied immunity was Deputy John McLain, the man responsible for confirming that the deputies had the right house.  He appeals the district court's order denying him qualified immunity, asserting that he made reasonable efforts to confirm that the house identified in the warrant was, in fact, the one he had been told was part of a drug dealing operation.  We reverse the district court's order denying him qualified immunity because his conduct did not violate "clearly established" law when it occurred.

The district court accurately characterized the facts drawn from the evidence construed in the light most favorable to White:

> In October 2012, [McLain] received information from a confidential informant that an individual was involved in the distribution of marijuana and that the individual was storing drugs at his girlfriend's residence located at 1817 Toulmin Avenue, Mobile, Alabama.  McLain and the confidential informant drove past the residence and the informant pointed out the house to McLain.  Three months later, McLain received corroboration from a different confidential informant.  Both informants told McLain that the house in question was the second house on the left after turning from St.

2

Stephens Road.  A month later, the second informant again told McLain about the drug activity at 1817 Toulmin Avenue.

On February 5, 2013, McLain traveled to Toulmin Avenue [again].  However, rather than entering from St. Stephens Road, he turned onto Toulmin Avenue from Carleton Street, which resulted in him approaching the house from the opposite direction he would have if he had entered from St. Stephens Road.  When approaching from St. Stephens Road, the first house on the left i[s] situated further back from the street than the other houses on Toulmin Avenue.  McLain approached what he "believed to be the second house" and took a photograph of it.  The house he took a photograph of was 1819 Toulmin Avenue.  White's house, 1819 Toulmin Avenue, is the third house on the left when approaching from St. Stephens Road and the target house, 1817 Toulmin Avenue, is the second house on the left.

Before taking the photograph, as McLain approached 1817 Toulmin Avenue, he noticed people who he thought appeared to be engaged in drug activity, standing in front of what McLain thought was 1817 Toulmin Avenue.  "So not to expose [himself] as a narcotics officer," McLain "pulled off the side of the road" and took a photograph of White's home, which he "believed to be" 1817 Toulmin Avenue.  Though not visible in the photograph McLain took, White's numerical street address (1819) is posted at eye level to the left of his front door.

In the darkness of the early morning hours of February 6, 2013, McLain travelled to Toulmin Avenue to check out information from an informant.  [The] informant had told McLain that a "certain vehicle dropped off some drugs" and "[McLain] was trying to determin[e] if that vehicle was at the location."  Neither 1817 nor 1819 Toulmin Avenue had any residential lights turned on when McLain passed.  Looking straight at 1817 Toulmin Avenue, its driveway is on the right side of the house.  From the same vantage point, 1819 Toulmin Avenue is to the right side of 1817 Toulmin Avenue.  McLain observed the vehicle he had been looking for, and it was parked "back behind the house."

As a result of the information McLain obtained from the informants and the details uncovered during investigation, he obtained a search warrant for 1817 Toulmin Avenue.  However, in the search

3

warrant application, he attached a picture of 1819 Toulmin Avenue rather than 1817 Toulmin Avenue. Additionally, McLain's written description of the place to be search[ed] described the façade of 1819 rather than 1817 Toulmin Avenue.

Later that morning, McLain briefed members of the Mobile County Sheriff's Office Narcotics and Vice Unit about the upcoming search of 1817 Toulmin Avenue. Defendant Deputies Johnny Thornton, Sr., John Cassidy, Allen O'Shea, Greg O'Shea, Jeffrey Sullivan, and Clinton Law were present at the briefing. During this meeting, McLain showed the deputies a photograph of White's house, which was 1819 Toulmin Avenue and told them that this was the house where the search warrant was to be executed.

After the briefing, the Defendants travelled in several vehicles to Toulmin Avenue. When the deputies arrived at 1819 Toulmin Avenue, several of them attached a truck's winch hook to the burglar bars on the front door. Other deputies arranged themselves outside the home. McLain gave the "go" signal and deputies pulled the burglar bars from the front door. Deputy John Cassidy forced entry into the home using a ram. Defendant Deputy Clinton Law entered the home first, holding a riot shield. McLain, Greg O'Shea, Johnny Thornton, and Captain Razzie Smith followed Law into the home.

Prior to the Defendants' entry, White was home preparing to attend a doctor's appointment. As the Defendants entered his home, White was moving from his bedroom into the hallway. Law detained White, kicking his legs apart and placing him in handcuffs. Law also forced White to get down on the floor of the bathroom. Law used his hands to push White onto the floor while yelling for White to get down.

Within minutes the Defendants realized their error. Captain Razzie Smith brought White up from the floor and removed the handcuffs from his wrists. Smith apologized to White and explained that there had been a mix-up and that White's home had been entered in error.

In January 2013, the month before the search, White underwent abdominal surgery. On February 6, 2013, White had a pre-scheduled appointment with his doctor several hours after the search. His doctor

4

checked his incision, which was not leaking at that time. Several hours later, White went to the emergency room at Mobile Infirmary, complaining of pain and experiencing leakage from his surgical incision. He was admitted and treated at the hospital. He seeks damages including but not limited to medical expenses, and compensation for the physical and emotional injuries he suffered as [a] result of the events of February 6, 2013.

White v. McLain, No. 14-502-KD-M, 2015 WL 7196412, at *1–3 (S.D. Ala. Nov. 16, 2015) (citations omitted).

Relying heavily on our decision in Hartsfield v. Lemacks, 50 F.3d 950 (11th Cir. 1995), the district court denied McLain qualified immunity. It concluded that, although McLain's was "undoubtedly an honest mistake," his "actions in this case were simply not consistent with a reasonable effort to ascertain and identify the place intended to be searched." White, 2015 WL 7196412 at *7 (quotation marks omitted). We review de novo a district court's denial of qualified immunity. Perez v. Suszcynski, 809 F.3d 1213, 1216 (11th Cir. 2016).

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their [official] conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982). A government official seeking qualified immunity "must prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred,"

5

Hartsfield, 50 F.3d at 953, and White does not dispute that McLain was. "[I]f the official meets that burden, the plaintiff must prove that the official's conduct violated clearly established law." Harbert Int'l, Inc. v. James, 157 F.3d 1271, 1281 (11th Cir. 1998). A law is "clearly established" only when preexisting law gave government officials "fair warning" that their conduct was unconstitutional. Hope v. Pelzer, 536 U.S. 730, 741, 122 S. Ct. 2508, 2516 (2002).

Because then-existing law did not fairly warn McLain that his conduct leading up to the search violated federal law in the circumstances," he is entitled to qualified immunity here. None of our precedents holds — or logically compels the conclusion — that an officer's well-intentioned attempts to ascertain and identify the property described in a warrant are not reasonable simply because they lead to an error, or because more accurate means of ascertaining the property's identity were available. That might be the better rule, but it is not a rule that was clearly established in this circuit when the events giving rise to this lawsuit happened.

White relies on our Hartsfield decision, but it does not clearly establish what White needs to defeat McLain's defense of qualified immunity. In that case, a confidential informant took Deputy Sheriff Mike Newton to a residence at 5108 Middlebrooks Drive, where the informant purchased marijuana from an occupant. Based on those events, Newton obtained a search warrant for 5108 Middlebrooks Drive. The next day, however, when he returned with other law enforcement

officers to execute the warrant, he mistakenly led the team to the residence at 5128

Middlebrooks Drive.  The officers forcibly entered that home with guns drawn.

Only several minutes later — after the residence's innocent occupant had a gun

pointed at her head and a police dog had sniffed around her home — did the

officers realize their error.  When Newton asserted qualified immunity, the district

court denied his motion.  We affirmed the denial, reasoning that:

> [a]lthough we recognize the need to allow some latitude for honest mistakes that are made by officers in the dangerous and difficult process of making arrests and executing search warrants, . . . Newton's actions in this case were simply not consistent with a reasonable effort to ascertain and identify the place intended to be searched, as dictated by [Maryland v. Garrison, 480 U.S. 79, 107 S. Ct. 1013 (1987)]."

Hartsfield, 50 F.3d at 955.  As we explained elsewhere in the opinion:

> Newton had been to the proper residence the day before the search and had procured the search warrant based upon his own observations supervising a drug buy at 5108 Middlebrooks.  Although Newton had the warrant in his possession, he did not check to make sure that he was leading the other officers to the correct address, let alone perform any precautionary measures such as those performed by the officers in Garrison.  As it is uncontroverted that the numbers on the houses are clearly marked, and that the raid took place during daylight hours, simply checking the warrant would have avoided the mistaken entry.  Moreover, evidence before the court showed that the houses were located on different parts of the street, separated by at least one other residence, and that their appearance were distinguishable.
>
> Because Newton did nothing to make sure that he was leading the other officers to the correct residence, we conclude that the district court erred in holding that he was protected by qualified immunity.

Id.

7

There are obvious differences between that case and this one.  In <u>Hartsfield</u>, "Newton did *nothing* to make sure that he was leading the other officers to the correct address."  <u>Id.</u> (emphasis added); <u>see also</u> <u>id.</u> (characterizing the law enforcement conduct at issue as "searching the wrong residence when [Newton] had done nothing to make sure he was searching the house described in the warrant").  McLain, by contrast, did attempt to ascertain and verify that he had the right house.  He revisited the block where the house sits, took a photograph of what he perceived to be the second house on the left coming off of St. Stephens Road (the description one of the confidential informants had given of the house to be searched), and verified that a car associated with the trafficking appeared to be parked behind the house he had identified.  His attempts were ineffectual, but he made them, which is more than Newton did.  The <u>Hartsfield</u> Court, after all, repeatedly noted and expressly rested its holding on the fact that "Newton did nothing."  We cannot say that the <u>Hartsfield</u> decision put law enforcement personnel on notice (that is, gave them fair warning) that an officer who attempts to ascertain and verify the identity of the place to be searched violates the Fourth Amendment if he fails to do everything possible to ensure that he is not mistaken.

The portion of the district court's order denying qualified immunity to Deputy McLain is **REVERSED** and the case is **REMANDED** for further proceedings consistent with this opinion.

8