**FOR PUBLICATION**

In the

United States Court of Appeals

For the Eleventh Circuit

————————————

No. 24-11157

————————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*versus*

STEVEN BERNE SCHMITZ,

*Defendant-Appellant.*

————————————

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 9:23-cr-80102-RLR-1

————————————

Before ROSENBAUM, BRANCH, and KIDD, Circuit Judges.

BRANCH, Circuit Judge:

On January 25, 2023, law enforcement officers executed a search warrant that allowed them to search "4279 Violet Circle,

Lake Worth, FL 33461."[1]  The officers sought evidence against the defendant, Steven Schmitz.  At the time the officers swore out and executed the warrant, the officers believed 4279 Violet Circle was a single-family home that Schmitz occupied.

In fact, however, Schmitz lived in one of three efficiency apartments on the back of the single-family home at 4279 Violet Circle.  The apartments, including Schmitz's, lacked their own addresses, mailboxes, or any markings demarcating them as separate residences from the single-family home.  Accordingly, when the officers began executing the search warrant and asked for Schmitz, they had to be directed by residents in the other units to the front door of his apartment.  Inside, officers found the guns and drugs they were looking for, and Schmitz was charged with unlawful possession of those items.

Schmitz moved to suppress those guns and drugs, arguing that the search warrant was defective under the Fourth Amendment for listing the address of the single-family home—rather than his specific apartment—as the premises to be searched.  The district court denied Schmitz's motion, and Schmitz appeals that denial.  We now must decide whether the warrant complied with the Fourth Amendment despite not specifying Schmitz's apartment as the premises to be searched.  After careful review, and with the benefit of oral argument, we affirm.

---

[1] Officers actually executed two search warrants that day, but as we will explain, only one search warrant matters to the resolution of this appeal.

## I.    Background

In June 2023, a federal grand jury indicted Schmitz for firearm and drug offenses.[2]   Subsequently, Schmitz moved to suppress all evidence arising out of the search of his apartment.  He argued that the warrants supporting the search were defective because they listed "4279 Violet Circle" as the premises to be searched, but officers actually sought to search Schmitz's apartment, which was an efficiency apartment *carved out of* the single-family home at 4279 Violet Circle.

The magistrate judge held a hearing on Schmitz's motion.  At the hearing, the magistrate judge received into evidence the two search warrants and county property records.  The magistrate judge also heard testimony from Jose Rosana, who was Schmitz's landlord, and Agent Carlos Valencia.

Rosana testified that she lives at and owns the property at 4279 Violet Circle, Lake Worth, Florida, with her husband Jean Gaetan.  Rosana and Gaetan's property included their single-family home (the "main residence") and three efficiency apartments.  The apartments are carved out from the main residence.  Rosana explained that "to get to the efficiency apartments . . . from the

---

[2] Specifically, the grand jury charged Schmitz with (1) possessing with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C); (2) possessing a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A)(i); (3) being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1); and (4) possessing a firearm with an obliterated serial number in violation of 18 U.S.C. § 922(k).

street," one would "walk up the driveway and through the gate" and enter the backyard of the main residence. The efficiency apartments do not have their own mailboxes; the entire property has just one mailbox labeled "4279." There are no other labels, even on the efficiency apartments themselves, to indicate the existence of the efficiency apartments. Nor are the efficiency apartments separately designated as, for example, Apartments 1, 2, and 3, or Apartments A, B, and C, or any other names. Rosana confirmed that "unless you enter the backyard of [the main] residence, you wouldn't know if those efficiencies existed." Even "standing directly in front" of the main residence, a person would not be able to tell that the efficiency apartments existed.

Rosana and Gaetan had rented out each of the apartments in January 2023. Schmitz was one of their tenants. While Schmitz lived in the efficiency apartment, four cars were typically parked in the driveway at 4279 Violet Circle: Rosana's, Gaetan's, Schmitz's, and another tenant's.

Rosana then testified about the events of January 25, 2023. She explained that on that day, a man arrived at the main residence and asked her: "can I go to open my new home." The man claimed he worked for the city, but he showed no badge or other identification. Rosana "just closed [her] door because [she] thought he was a wrong guy or a bad guy." She then watched him get into his car and sit in her driveway for a few minutes. After that interaction, Rosana left to run errands, and she saw police officers on her street and standing in her driveway as she left. Rosana

approached and asked the officers if "[s]omething happened," but one said "it is okay." Rosana then ran her errands and returned home to meet her sister-in-law. Neither woman was approached by the officers outside.

Shortly thereafter, however, an officer knocked and demanded that Rosana open the door. The officer told Rosana he "want[ed] to see the entrance to go in the backroom." Rosana told the officer she did not have an entrance into the efficiency apartments from the main residence. According to Rosana's testimony, officers then went around back and entered Schmitz's efficiency apartment. Despite seeing many police cars at that point, she did not see the same car that she had seen the "bad guy" from earlier get into.

After Rosana testified, Valencia took the stand. Valencia was a narcotics agent who had been investigating Schmitz since June 2022. As part of the investigation, Valencia and his team surveilled 4279 Violet Circle at least once per week. From their surveillance vantage points up the road from the main residence, officers could only ever see the roadway, driveway, and grassy area in front of the main residence.[3] Officers never surveilled 4279 Violet Circle from the rear. Valencia was able to determine that "several people" resided at 4279 Violet Circle because there were "a lot of vehicles in the residence," but he was never able to see people enter the residence from his vantage points. Because he

---

[3] Valencia later testified that officers would not park directly in front of the residence to avoid Schmitz learning he was under investigation.

never saw the back of the home, Valencia would see Schmitz arrive and leave 4279 Violet Circle, but he never saw Schmitz actually enter the residence. Valencia also explained that at some point, officers conducted a trash pull at 4279 Violet Circle. During the trash pull, officers noted that 4279 Violet Circle had just one trash can, and in the trash officers found two baggies of marijuana residue and mail addressed to Rosana.

Valencia then turned to the events of January 25, 2023. That day, before the search of Schmitz's apartment, Valencia pulled Schmitz over and asked Schmitz if he lived at 4279 Violet Circle. Valencia testified that at that time, he did not know Schmitz lived in a separate apartment from the main residence. Schmitz denied living at 4279 Violet Circle. Valencia clarified, however, that it was common in his experience for drug traffickers not to tell him where they lived. During the traffic stop, Valencia "recover[ed] some keys" from Schmitz, which Valencia "assume[d] . . . might be to a residence."

Valencia wrote out a warrant affidavit "down the block" from 4279 Violet Circle while other officers "[m]aintain[ed] surveillance" in front of the residence. Valencia then went "to the primary door of the [main] residence, knocked on the door, [and] made announcements." Valencia testified officers "went in to secure the residence," then Rosana told Valencia that Schmitz did not live in the main residence and directed Valencia "to the north side of the residence." Valencia then "went to the secondary door on the north side" and discovered "[t]here was a family there."

Officers "started searching there, [and] asked if Schmitz lived there." The family "said no and pointed towards another door on the north side."

At the other apartment door, Valencia knocked and made announcements, but nobody answered. Valencia "then started using the keys that were retrieved from Mr. Schmitz." The keys worked, and officers entered the apartment. Once inside the residence, officers "recovered several firearms," so Valencia drafted a second search warrant for those firearms. In the second search warrant, Valencia "pretty much . . . just copied and pasted the original search warrant, and then just added [his] narrative." Valencia did not specify that "this was an apartment at the residence and not the main residence" because there were "no individual markings on the door which indicated it was an apartment" and the property records "show[ed] that it's the residence of 4279; so there was no indication saying that that was a separate address." Valencia also testified that "the entire building"—the main residence plus the efficiency apartments— "seem[ed] to be connected together," and a door appeared to connect Schmitz's apartment to the main residence. Valencia testified that when he initially applied for the search warrant, he did not know about the efficiency apartments on the property despite reviewing property records. The county property appraisal stated that the residence "was a one single-family home."

The exhibits introduced at the hearing corroborated Valencia's testimony. In Valencia's affidavit in support of the first

search warrant, he sought to search "4279 Violet Circle, Lake Worth FL 33461," which Valencia described as "a single family residence" that "has a tan mailbox with the numbers 4279 affixed to it." Valencia sought identification documents, controlled substances, and currency. The first search warrant permitted Valencia to search the premises described—4279 Violet Circle and "all . . . outbuildings"—for the listed contraband. Valencia's affidavit in support of the second search warrant listed the same premises with the same description and sought the same contraband, plus "[f]irearms and ammunition." The second search warrant again authorized Valencia to search 4279 Violet Circle and any outbuildings for the listed contraband. Finally, the Palm Beach County property appraisal for 4279 Violet Circle stated that there is one unit, a single-family home, on the property.

After the evidentiary hearing, the magistrate judge issued a report and recommendation ("R&R") that the district court deny Schmitz's motion to suppress. Specifically, the magistrate judge recommended holding that the officers acted in good faith when they submitted their warrant affidavits and believed that the search warrants authorized them to search Schmitz's efficiency apartment, even though the premises to be searched was "4279 Violet Circle." In so recommending, the magistrate judge explicitly found Valencia's testimony to be credible.

Schmitz objected to the R&R. In a paperless order, the district court adopted the R&R and denied Schmitz's motion to suppress. To preserve an appeal of this denial, Schmitz proceeded

with a stipulated-facts bench trial.  The district court found Schmitz guilty on all four counts.  The district court sentenced Schmitz to 84 months' concurrent imprisonment on counts one, three, and four, and 60 months' consecutive imprisonment on count two, for a total of 144 months' imprisonment.[4]  Schmitz timely appealed.

## II.    Standard of Review

"A denial of a motion to suppress involves mixed questions of fact and law."  *United States v. Campbell*, 26 F.4th 860, 870 (11th Cir. 2022) (*en banc*) (citation omitted).  When reviewing the denial of a motion to suppress, we review the district court's findings of fact for clear error and its application of law to those facts *de novo*, construing all facts in the light most favorable to the prevailing party.  *Id*.  We must accept the version of events credited by the district court "unless it is contrary to the laws of nature, or is so inconsistent or improbable on its face that no reasonable factfinder could accept it."  *United States v. Ramirez-Chilel*, 289 F.3d 744, 749 (11th Cir. 2002) (internal quotations omitted).

Additionally, "[c]redibility determinations are typically the province of the fact finder because the fact finder personally

---

[4] The amended judgment incorrectly states that Schmitz "pleaded guilty" to counts one through four of the indictment.  We may *sua sponte* notice a clerical error in the judgment and remand with instructions to correct the error.  *See United States v. Anderton*, 136 F.3d 747, 751 (11th Cir. 1998) (per curiam).  Because the amended judgment does not accurately reflect that Schmitz pleaded not guilty and proceeded with a bench trial, we will order a remand for the limited purpose of correcting the judgment to reflect that Schmitz was found guilty after pleading not guilty.

observes the testimony and is thus in a better position than [we are] to assess the credibility of witnesses." *Id.* Thus, "we afford substantial deference to the factfinder's" explicit and implicit "credibility determinations." *United States v. Lewis*, 674 F.3d 1298, 1303 (11th Cir. 2012).

## III.    Discussion

On appeal, Schmitz argues that the Fourth Amendment requires the evidence against him to be suppressed because the first search warrant[5] lacked requisite particularity, and the officers knew, or reasonably should have known, that Schmitz lived in a separate apartment from the main residence at 4279 Violet Circle. The government responds that the first search warrant was sufficiently particular to satisfy the Fourth Amendment. We agree with the government.[6]

---

[5] The parties agree that "this case rises and falls with the first warrant." So do we. If the first warrant was lawful, then under the Fourth Amendment's plain-view doctrine, the officers could have seized the firearms without seeking the second search warrant at all. *See United States v. Smith*, 459 F.3d 1276, 1290 (11th Cir. 2006) ("The plain view doctrine allows police officers to seize any contraband in plain view if the officers have a right of access to the place where the contraband is located." (citation omitted)). Accordingly, our analysis focuses solely on the first search warrant. Because we conclude that the first search warrant complied with the Fourth Amendment's particularity requirement, we need not—and do not—reach the particularity of the second search warrant.

[6] The R&R did not address whether the search warrants met the Fourth Amendment's particularity requirement, instead relying on the good-faith exception to the Fourth Amendment's requirements to resolve Schmitz's motion. But "we may affirm the denial of a motion to suppress on any ground

24-11157                Opinion of the Court                11

The Fourth Amendment provides, in relevant part, that search warrants must "particularly describ[e] the place to be searched." U.S. Const. amend. IV. "This particularity requirement exists to protect individuals from being subjected to general, exploratory searches." *United States v. Moon*, 33 F.4th 1284, 1296 (11th Cir. 2022) (internal quotations omitted); *see also Maryland v. Garrison*, 480 U.S. 79, 84 (1987). But "[e]laborate specificity is unnecessary." *United States v. Strauss*, 678 F.2d 886, 892 (11th Cir. 1982). A "warrant need only describe the place to be searched with sufficient particularity to direct the searcher, to confine his examination to the place described, and to advise those being searched of his authority." *United States v. Burke*, 784 F.2d 1090, 1092 (11th Cir. 1986). "An erroneous description of premises to be searched does not necessarily render a warrant invalid," so long as "the search warrant describe[s] the premises in such a way that the searching officer may with reasonable effort ascertain and identify the place intended." *Id.* (internal quotations omitted). If a warrant violates the Fourth Amendment's particularity requirement, then the exclusionary rule "prohibits the government from relying on evidence obtained" under that warrant (*i.e.*, a motion to suppress must be granted). *United States v. McCall*, 84 F.4th 1317, 1323 (11th Cir. 2023), *cert. denied*, 144 S. Ct. 1042 (2024).

---

supported by the record." *United States v. Caraballo*, 595 F.3d 1214, 1222 (11th Cir. 2010). We do so here. Accordingly, we do not reach the parties' arguments about the good-faith exception or how the magistrate judge applied that exception.

In *Garrison*, the Supreme Court addressed a situation analogous to Schmitz's, in which a search warrant described the premises to be searched too broadly. "Baltimore police officers obtained and executed a warrant to search the person of Lawrence McWebb and the premises known as 2036 Park Avenue third floor apartment." 480 U.S. at 80 (internal quotation marks omitted). When police applied for and began executing the warrant, "they reasonably believed that there was only one apartment on the premises described in the warrant." *Id.* Their belief was based on "verification of information obtained from a reliable informant, an exterior examination of the three-story building at 2036 Park Avenue, and an inquiry of the utility company." *Id.* at 81. But in fact, there were two apartments—one belonging to McWebb and the other belonging to Garrison—and officers entered the wrong one: Garrison's. *Id.* at 80. In Garrison's apartment, officers "discovered the contraband that provided the basis for [Garrison's] conviction." *Id.* "Only after [Garrison's] apartment had been entered and heroin, cash, and drug paraphernalia had been found did any of the officers realize that the third floor contained two apartments." *Id.* at 81.

The Supreme Court upheld the validity of the warrant against Garrison's challenge. With the benefit of hindsight, the Court knew that "the description of [the place in the warrant] was broader than appropriate because it was based on the mistaken belief that there was only one apartment on the third floor of the building at 2036 Park Avenue." *Id.* at 85. But the Court emphasized that the constitutionality of the warrant depended on

the "information available to [the officers] at the time they acted." *Id.* "The validity of the warrant must be assessed on the basis of the information that the officers disclosed, or had a duty to discover and to disclose, to the issuing Magistrate." *Id.* "[T]he discovery of facts demonstrating that a valid warrant was unnecessarily broad does not retroactively invalidate the warrant." *Id.*; *see also, e.g.*, *United States v. Ofshe*, 817 F.2d 1508, 1514 (11th Cir. 1987) (citing *Garrison* and declining to invalidate a warrant because "the agents reasonably believed, until they entered the premises, that the office space belonged solely to" the business they were investigating when, in fact, "the premises described in the warrant were subdivided into separate offices"). The Court cautioned, however, that if "the officers had known, or even if they should have known, that there were two separate dwelling units on the third floor of 2036 Park Avenue, they would have been obligated to exclude respondent's apartment from the scope of the requested warrant." *Garrison*, 480 U.S. at 85.[7]

*Garrison* controls our conclusion in this case that the search warrant complied with the Fourth Amendment's particularity

---

[7] In dicta, the Court also "expressly distinguish[ed]" the facts of *Garrison* "from a situation in which the police know there are two apartments on a certain floor of a building, and have probable cause to believe that drugs are being sold out of that floor, but do not know in which of the two apartments the illegal transactions are taking place." *Garrison*, 480 U.S. at 88 n.13. The Court observed that a "search pursuant to a warrant authorizing a search of the entire floor under those circumstances would present quite different issues from the ones before" the Court in *Garrison*. *Id.*

requirement and lawfully authorized a search of Schmitz's efficiency apartment. As in *Garrison*, "the description of [4279 Violet Circle] was broader than appropriate because it was based on the mistaken belief that there was only one" residence at that address when, in fact, there were four: the main residence and the three efficiency apartments. *Id.* But the officers' mistaken belief that 4279 Violet Circle was only one residence was premised on "a reasonable investigation," and the record does not demonstrate that the officers "had known, or even [that] they should have known, that there were . . . separate dwelling units" on the property when they sought the warrant. *Id.* at 81, 85.

Specifically, Valencia and his team surveilled 4279 Violet Circle at least once per week for over six months, but from their vantage points they could never see the efficiency apartments. The officers could see Schmitz arrive at and leave the property, but they could not see that Schmitz entered and exited the residence through his own door rather than through the main residence. Valencia and his team did not see any physical signs of multiple units because none existed. The house had just one mailbox, just one address, just one garbage can, and no exterior markings delineating the apartments. Indeed, it was impossible to see the attached efficiencies unless a person was in the backyard of the property. Additionally, officers conducted a trash pull that yielded mail with just one address on it along with drug residue for which officers were investigating Schmitz. And for good measure, Valencia reviewed county property records, which also revealed that 4279 Violet Circle was "one single-family home."

24-11157                Opinion of the Court                15

Only after officers executed the warrant did they learn that "4279 Violet Circle" includes premises that do not belong to Schmitz and that Schmitz cannot access. *See id.* at 81, 85. But this *ex post facto* "discovery of facts demonstrating that a valid warrant was unnecessarily broad does not retroactively invalidate the warrant." *Id.* at 85. Accordingly, because officers reasonably investigated 4279 Violet Circle and reasonably concluded that the property was just one residence, the search warrant listing just that address instead of Schmitz's specific apartment was valid.[8] *See id.*; *Ofshe*, 817 F.2d at 1514.

In opposition to the conclusion that *Garrison* controls this appeal, Schmitz tries to analogize his case to our decision in *United States v. Ellis*, 971 F.2d 701 (11th Cir. 1992), but this reference is unavailing. In *Ellis*, an officer "requested a warrant to search 'the third mobile home on the north side of Christian Acres Road' in Grand Bay, Alabama." 971 F.2d at 702. The officer did not know who inhabited that mobile home, and the warrant did not describe

---

[8] Although the warrant was sufficiently particular under the Fourth Amendment to search Schmitz's efficiency apartment, the officers still had an obligation to "limit their search to [Schmitz's] apartment" if they "had known, or should have known" the property was subdivided, "and thus had been aware of the error in the warrant." *Garrison*, 480 U.S. at 86. And they had to "discontinue the search of [the main residence and the other two efficiencies] as soon as they discovered that there were . . . separate units . . . and therefore were put on notice of the risk that they might be in a unit erroneously included within the terms of the warrant." *Id.* at 87. But the officers uncovered no evidence outside Schmitz's efficiency apartment, so the validity of the search in other parts of 4279 Violet Circle is not at issue in this appeal.

the mobile home in any greater detail. *See id.* Other officers then executed the warrant, and "by this time the officers knew that they were looking for Billy Ellis'[s] mobile home." *Id.* But "they had no knowledge of what the mobile home looked like or where it was, apart from the information in the warrant and affidavit." *Id.* "As a result, the officers relied on the warrant and went to the third mobile home," wherein the resident of that mobile home told the officers "that Billy Ellis actually lived at the fifth mobile home on the north side of the road." *Id.* at 702–03. Without corroborating this fact at all, "the officers accepted the neighbor's word at face value and went directly to the fifth mobile home." *Id.* at 703. We concluded that "the warrant did not describe the place to be searched with sufficient particularity" because "the only information in the warrant was erroneous": it included the wrong address, did not describe the mobile home physically, and did not include the name "Billy Ellis" such that "the officers could [have] use[d] their personal knowledge" about Ellis "to cure the warrant's deficiency." *Id.* at 703–04.

*Ellis* is not analogous to this case. In *Ellis*, the warrant was useless. *See id.* The warrant directed officers to search the completely wrong mobile home. *See id.* at 703. In other words, the warrant in *Ellis* did not "describ[e] the place to be searched" at all—it described a different home up the street. U.S. Const. amend. IV. Officers only ended up at the correct mobile home by "pure serendipity" after the resident of the wrong mobile home told them where Ellis lived. *Ellis*, 971 F.2d at 705. By contrast, the search warrant in this case led officers to the property that (1) included

Schmitz's apartment, and (2) the officers reasonably thought to be Schmitz's residence in its entirety. Unlike in *Ellis*, which involved separate, distinct mobile homes, Schmitz's apartment did not have any distinct address, markings, mailbox, garbage can, or the like that would demarcate it as separate or different from "4279 Violet Circle." His apartment was, in fact, on the property that the warrant identified as the premises to be searched. The only way the warrant could have been corrected would have been to narrow down the searchable area from information learned during the execution of the warrant, as in *Garrison*. But the warrant did not specify a different property altogether that was clearly not Schmitz's residence, as in *Ellis*. Thus, we reject Schmitz's argument that *Ellis* controls the outcome here.

Schmitz also contends that the officers knew or should have known before applying for the search warrant that he lived in a separate unit from the main residence. *See Garrison*, 480 U.S. at 85 ("Plainly, if the officers had known, or even if they should have known, that there were two separate dwelling units on the third floor of 2036 Park Avenue, they would have been obligated to exclude respondent's apartment from the scope of the requested warrant."). Schmitz argues several facts compel that conclusion, but we reject each in turn.

First, Schmitz argues that Valencia knew that Schmitz lived in a separate apartment because, according to Rosana's testimony, Valencia demanded to see the "backroom" when he entered the main residence. But Schmitz does not explain why Valencia

entered the main residence at all if Valencia supposedly knew Schmitz lived in a separate apartment. Indeed, Valencia's entry into the main residence and his "demand[] to see the entrance to the 'backroom'" suggest that Valencia thought Schmitz lived in a room *in* the main residence and Valencia wanted Rosana to take him there, not that he knew about a separate apartment.

Second, Schmitz cites the man claiming to be from the city who spoke to Rosana on the morning of the search and argues that this man "who asked to see [Rosana's] apartments" must have been "working with the police." But the district court did not err in finding that Valencia testified credibly. And he testified that neither he nor his team contacted any resident of 4279 Violet Circle before the officers executed the search warrant. Rosana testified that this man claimed to work for the city (not the police), and she did not see the man or his car again when officers executed the search warrant. Accordingly, in light of the district court's finding, we reject Schmitz's argument connecting the man to the police.

Third, Schmitz cites the testimonies of Valencia and Rosana regarding how the officers secured the premises and argues that officers must have "already kn[o]w[n] that Mr. Schmitz was living in a separate unit" from Rosana. Specifically, Valencia testified that while he was getting the search warrant, he "would have approached" people going in or out of 4279 Violet Circle to prevent possible evidence tampering. But Rosana testified that she ran an errand during that time and her sister-in-law came over, and officers did not stop them. According to Schmitz, officers left

Rosana alone because they must have known she lived in a different unit than Schmitz and, therefore, was not a risk for tampering with the evidence they sought.

Schmitz's argument, however, does not logically follow from the evidence he cites. Valencia was merely describing what he "would have" done to secure the premises and what his team "understood" while they "maintain[ed] surveillance" at 4279 Violet Circle. Valencia, however, was not on-scene at 4279 Violet Circle when Rosana ran her errand—he testified he was "[p]robably down the block, writing the search warrant." The officers who were present on-scene and chose not to stop Rosana when she left 4279 Violet Circle (notably, after *she* approached *them*) could have had any reason for letting her go. We cannot infer any particular reason from the record, let alone the reason Schmitz argues.[9] Moreover, officers began executing the search warrant almost immediately after Rosana and her sister-in-law returned to 4279 Violet Circle, mitigating any concern about evidence-tampering after Rosana's errand. Accordingly, we reject Schmitz's argument for lack of evidentiary support.

Fourth, Schmitz argues that a city permit put officers on notice that Rosana and Gaetan built the efficiency apartments, but the permit is of little use.[10] A review of the permit to which

---

[9] After all, we must "consider[] all the evidence in the light most favorable to the prevailing party—in this case, the Government." *Campbell*, 26 F.4th at 870.

[10] In his opening brief, Schmitz argues that a search of Palm Beach County's Planning and Zoning website "using Mr. Gaetan's name reveals numerous

Schmitz directs us shows that it would not have put police on notice that separate residences existed at all. True, the permit was for a "Guest House." But the description of the permit was for Rosana and Gaetan to "[c]onvert family room & porch into 1 bedroom and 1 bathroom addition." *Building—View Application*, ePZB, https://perma.cc/J6VC-FJQD. Nothing about that description suggests that Rosana and Gaetan were turning parts of their house into three separate apartments that they were then planning to rent out.

Finally, Schmitz argues that police should have known multiple units existed on the property because officers knew "several unrelated people were actively living there." We reject the logic of this argument. Unrelated people sharing a single-family home is not an uncommon phenomenon. Without more, the fact that unrelated people lived at 4279 Violet Circle could not put police on notice that the property had multiple distinct residences.

In sum, Schmitz has failed to show that the officers in this case knew or should have known that 4279 Violet Circle was a multi-unit residence. Indeed, the record reflects that officers reasonably believed, based on a reasonable investigation, that the residence was a single-family home when they sought the first

permits" for 4279 Violet Circle. But Schmitz points to just one permit for 4279 Violet Circle, permit number B-2021-018944-0000. That permit includes sub-permits, but the sub-permits do not add any further detail to the information already included in permit number B-2021-018944-0000.

search warrant.  Accordingly, the warrant was valid.  *See Garrison*, 480 U.S. at 85.  Thus, the district court properly denied the motion to suppress.  *Cf. McCall*, 84 F.4th at 1322–23 (noting that the exclusionary rule applies only if officers violate the Fourth Amendment).

## IV.    Conclusion

For the foregoing reasons, we affirm the denial of Schmitz's motion to suppress and remand for the limited purpose of correcting the clerical error in the amended judgment.

**AFFIRMED IN PART, VACATED AND REMANDED IN PART.**

24-11157                KIDD, J., Concurring                1

KIDD, Circuit Judge, concurring:

I agree with the majority's conclusion that the officers in this case conducted a reasonable investigation to describe Schmitz's residence with particularity in the search warrant at issue. I write separately to highlight that our inquiry does not necessarily end there. Instead, as in *Maryland v. Garrison*, this case presents "two separate constitutional issues, one concerning the validity of the warrant and the other concerning the reasonableness of the manner in which it was executed." 480 U.S. 79, 84 (1987). The second inquiry requires us to assess whether the description that resulted from the officers' reasonable investigation was *also* "such that the officer with a search warrant [could] with reasonable effort ascertain and identify the place intended." *Steele v. United States*, 267 U.S. 498, 503 (1925); *see also United States v. Burke*, 784 F.2d 1090, 1092 (11th Cir. 1986). And a close reading of our precedent shows that knowledge acquired after the warrant's signing *can* influence whether and to what extent the officers are authorized to search a particular location.

A few cases illustrate this point. I start with *Maryland v. Garrison* itself. In that case, the officers had a warrant to search the third floor of a building, and when they arrived at the third floor, they had two options: left or right. 480 U.S. at 81. They went right, but chose wrong. *Id.* Once the officers realized their mistake, they stopped searching Garrison's apartment. *Id.* The majority opinion cites *Garrison* for its conclusion that the "*ex post facto* 'discovery of facts demonstrating that a valid warrant was unnecessarily broad

does not retroactively invalidate the warrant.'" Majority Op. at 16 (quoting *Garrison*, 480 U.S. at 85). But, as the majority notes, the *Garrison* Court also warned, "If the officers had known, or should have known, that the third floor contained two apartments before they entered the living quarters on the third floor, and thus had been aware of the error in the warrant, they would have been obligated to limit their search to [the named] apartment." *Garrison*, 480 U.S. at 86–87. Our Fourth Amendment inquiry, therefore, cannot end with the officers' knowledge at the time of issuance when their post-signing awareness of an error "in the warrant" could result in a constitutional limitation on the scope of their search. *Id.* at 86.

Another example arose in *United States v. Ofshe*, 817 F.2d 1508 (11th Cir. 1987), where we considered the reasonableness of the execution of a warrant to search a commercial building with multiple offices. The warrant particularly described the business and the building where it was located, and it provided the building's address. *Id.* at 1514. Only at the time of execution did agents learn that the building contained multiple offices with multiple businesses. *Id.* Upon learning this information, the agents limited their search to the property and offices that belonged to the target business. *Id.* Because "the agents followed exactly the authority of the warrant" in limiting their search, we found that "[t]heir actions were reasonable." *Id.* So this is another case where knowledge gained after signing required the officers to limit the scope of their search.

24-11157                    KIDD, J., Concurring                    3

The last case I will use to illustrate this point is *United States v. Ellis*, 971 F.2d 701 (11th Cir. 1992), which both Schmitz and the majority opinion cite. The search warrant in that case erroneously named "the third mobile home on the north side of Christian Acres Road" and did not list the name of the target, Billy Ellis. *Id.* at 702. We found a violation of the Fourth Amendment and observed that "an erroneous search was averted in this case by pure serendipity: the inhabitant of the third mobile home just happened to be home to stop the officers from searching that residence, and that inhabitant just happened to direct the officers to the correct mobile home." *Id.* at 705.

*Ellis* is a useful contrast to this case. Here, the warrant specifically stated that the premises were "occupied by, or under the control of: Steven Schmitz." And the address provided was the only one for the property. Upon learning that the house was subdivided into multiple efficiency apartments, the officers asked the owner which one belonged to Schmitz. The officers went where they were directed, and they faced two options. As in *Garrison*, the officers here chose the wrong option—they entered a unit that belonged to another family. But when the officers determined that Schmitz did not live in the unit with the family, they ceased their search, knocked on the only other door,[1] and used Schmitz's key to enter his unit.

---

[1] The majority opinion states that Schmitz lived in one of the subject property's three efficiency apartments, which is consistent with a portion of the testimony given by Schmitz's landlord during the suppression hearing. *See*

4                    KIDD, J., Concurring                    24-11157

Did the search warrant's description require the officers to exert more effort than the Fourth Amendment reasonably allows to identify Schmitz's residence? Under the circumstances, I conclude that it did not. The officers' actions here were reasonable. But reaching that conclusion requires us to consider the officers' knowledge and actions *after* the signing of the search warrant.

---

Majority Op. 2, 4, 15, 21. However, for Schmitz's bench trial, the parties stipulated that the subject residence "was a single family home that contained two separate efficiency apartments that were attached to the main residence." I therefore assume, for the purposes of this discussion, that there were only two efficiency apartments, one inhabited by Schmitz and one inhabited by another family.